UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re UNITEDHEALTH GROUP INCORPORATED PSLRA LITIGATION | ) ) | Civ. No. 0:06-cv-01691-JMR-FLN |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS. | ) | |
| | ) | |

AFFIDAVIT OF RAMZI ABADOU IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS AND REIMBURSEMENT OF LEAD PLAINTIFF'S EXPENSES; AND AWARD OF ATTORNEYS' FEES

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 2

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................. 8

III.   HISTORY OF THE ACTION ............................................................... 10

IV.   THE LITIGATION ............................................................................... 12

     A.   Defendants' Motions to Dismiss the Complaint ......................... 12

     B.   Lead Plaintiff's Motion for a Preliminary Injunction ................. 15

     C.   Lead Plaintiff's Motion for Partial Summary Judgment ............. 19

     D.   Plaintiffs' Motion for Class Certification .................................... 19

     E.   Fact Discovery .............................................................................. 20

          1.   Written Discovery to Defendants .................................... 20

          2.   Depositions ...................................................................... 22

          3.   Third Party Discovery ..................................................... 24

          4.   In-House Forensic Accounting Experts ........................... 26

     F.   Discovery Disputes ....................................................................... 31

     G.   Disputes Concerning the Protective Order ................................... 35

     H.   Informal Interviews ...................................................................... 36

     I.   Expert Witness Discovery for Trial ............................................. 36

     J.   The Fruits of Plaintiffs' Discovery Efforts ................................. 39

     K.   Summary Judgment and Related Evidentiary Motions ................. 42

     L.   Trial Preparation .......................................................................... 45

V.   THE STRENGTHS AND WEAKNESSES OF THE CASE ................. 46

VI.   SETTLEMENT NEGOTIATIONS AND TERMS OF THE
      SETTLEMENT ..................................................................................... 47

**Page**

VII.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS
        AND WARRANTS APPROVAL ........................................................................ 51

VIII.   THE PLAN OF ALLOCATION ......................................................................... 51

STATE OF CALIFORNIA      )
                             ) ss.

COUNTY OF SAN DIEGO    )

      1.      I, RAMZI ABADOU, am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*.  I am a member of Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia" or "Lead Counsel"), counsel for Lead Plaintiff California Public Employees' Retirement System ("CalPERS" or "Lead Plaintiff"), Alaska Plumbing and Pipefitting Industry Pension Trust (collectively, "plaintiffs") and the Class.  I have been actively involved in the initiation, prosecution and resolution of this action (the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the Litigation.

      2.      I submit this affidavit in support of plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation of Settlement dated as of November 12, 2008 (the "Stipulation"), which provides for a cash settlement of $925,500,000 (the "Settlement Fund"), UnitedHealth Group Incorporated's ("UnitedHealth" or the "Company") agreement to implement certain important corporate governance changes, and William W. McGuire's ("McGuire") agreement to forfeit certain stock options previously granted to him; (b) Lead Counsel's application for attorneys' fees and reimbursement of the Lead Plaintiff's time and expenses incurred in prosecuting the Litigation; and (c) the proposed Plan of Allocation.

## I.     PRELIMINARY STATEMENT

3.     This case has been litigated unyieldingly from its commencement in May 2006 through settlement, which was not finalized until September 10, 2008, when trial seemed imminent.  At every stage of the Litigation, defendants asserted aggressive defenses.  The settlement was achieved only after Lead Counsel, or its agents, *inter alia*: (i) conducted detailed investigative interviews of witnesses, including former employees of UnitedHealth; (ii) successfully opposed defendants' various motions to dismiss; (iii) obtained a preliminary injunction against McGuire; (iv) engaged in ancillary proceedings related to this preliminary injunction which required extensive briefing in both the Eighth Circuit Court of Appeals and the Supreme Court of Minnesota; (v) obtained class certification over defendants' aggressive opposition; (vi) conducted extensive discovery, including reviewing and analyzing approximately 25 million pages of documents produced by defendants and non-party witnesses; (vii) deposed over 45 fact witnesses; (viii) responded to discovery propounded by defendants; (ix) produced more than 3.7 million pages of documents in response to defendants' document requests; (x) prepared lengthy, detailed responses to contention interrogatories and requests for admission; (xi) successfully litigated numerous complex discovery motions; (xii) successfully litigated several motions concerning the Protective Order; (xiii) opposed defendants' various motions for summary judgment; (xiv) completed expert discovery involving 10 testifying experts in the areas of accounting, materiality, loss causation, damages, executive compensation and metadata, which included the preparation and review of expert reports; (xv) took or defended the depositions of 9 expert witnesses;

and (xvi) began preparing for trial, including selecting the exhibits to be used at trial and negotiating a stipulation with defendants as to the authenticity of the exhibits.

4.      This settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel with a firm understanding of both the strengths and weaknesses of their respective cases. The settlement of $925,500,000 represents one of the largest cash settlements in securities class action history, the largest securities class action settlement ever in the Eighth Circuit and is believed to be one of the top 10 settlements achieved anywhere since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

5.      Plaintiffs believe that this settlement represents an excellent result. By the time the settlement was reached, plaintiffs had conducted and completed significant discovery, reviewed and analyzed tens of millions of pages of documents, interviewed numerous witnesses, taken the depositions of 55 fact and expert witnesses, engaged in extensive motions practice and had begun preparing for trial. This substantial discovery, motions practice and trial preparation informed plaintiffs that, while their case had strengths, it also had significant weaknesses, which, along with a number of external factors, had to be, and were, conscientiously evaluated in determining what course of action was in the best interest of the Class.

6.      As set forth below, despite the fact that certain of plaintiffs' allegations had received support from the documentary evidence as well as deposition testimony, there remained many uncertainties in plaintiffs' case.

7.     The gravamen of plaintiffs' 178-page Consolidated Complaint for Violation of the Federal Securities Laws Seeking Money Damages and Equitable Relief ("Complaint") was that defendants participated in a scheme to deceive investors and enrich themselves by manipulating the Company's stock option grants in violation of securities laws, known accounting standards and UnitedHealth's publicly stated policies.  Rather than granting options at the market price on the date of grant, defendants "backdated" stock options.  That is, defendants granted stock options as of an earlier date when the stock price was lower than the actual grant date, guaranteeing themselves an instant, riskless profit upon exercise. Plaintiffs alleged that during the Class Period (January 20, 2005 to May 17, 2006), defendants made a series of misrepresentations and omissions concerning their stock option grants and compensation practices that resulted in false financial statements and artificially inflated the price of UnitedHealth's stock.  For example, plaintiffs alleged that defendants falsely represented that they were not required to record compensation expense arising from the options under Accounting Principles Board Opinion ("APB") No. 25.  Plaintiffs alleged that these public misrepresentations resulted in a material overstatement of the Company's financial results and falsely reassured investors concerning the soundness of the Company's compensation and accounting practices.

8.     Defendants' misrepresentations allegedly caused the price of the Company's stock to be artificially inflated, reaching a high of $64.61 per share during the Class Period. This artificial inflation enabled defendants to exercise their stock options and obtain illegal profit not only from the fraudulent backdating but also from the artificial inflation.  The Complaint details that upon public disclosures revealing the falsity of UnitedHealth's public

statements, the price of the Company's common stock declined substantially, causing significant financial harm to UnitedHealth investors.

9.      In opting to settle the Litigation, plaintiffs considered the significant risks attendant to their claims.  For instance, the applicable accounting rules were subject to varying interpretations.  Defendants contended that plaintiffs could not demonstrate scienter because the principles involved in accounting for stock options were complex and required accounting expertise to decipher.  They argued further that they reasonably relied on UnitedHealth's outside auditors who failed to identify their accounting procedures as improper despite their access to documentation of the Company's stock option grant and accounting procedures.   Although plaintiffs disagreed with defendants' assertions, defendants offered both evidence and legal argument to bolster their defenses.

10.     There were also heavily-disputed issues concerning loss causation and damages.  Defendants contended that plaintiffs could not demonstrate loss causation because UnitedHealth's stock price suffered limited to no decline when the Company disclosed information related to its stock option practices.   Defendants further argued that any movement in the Company's stock price was caused by factors other than fraud, such as overall stock market movements or industry-related factors.  Defendants also contended that plaintiffs and the Class suffered no damages during the Class Period, and that plaintiffs' damages models contained errors and faulty assumptions.  While plaintiffs disagreed with all of defendants' contentions concerning loss causation and damages, there was a substantial risk of recovering limited or no damages if the Court or jury agreed with *any* of defendants' arguments.  Compounding these factors was a substantial risk that the Court would grant

- 5 -

defendants' motion to exclude the opinion and testimony of plaintiffs' damages expert.  This motion was fully briefed and awaiting oral argument at the time the parties reached settlement.

11.     Defendants also asserted several statute of limitations and Class Period defenses that, if successful, would have significantly undercut plaintiffs' estimate of §10(b) damages and would have potentially eliminated plaintiffs' §14(a) claim.  These arguments were fully briefed in connection with defendants' motions for summary judgment and the Court was awaiting oral argument at the time the parties agreed to settle the Litigation.  Although plaintiffs disagreed with defendants' analysis, there was a risk that the Court would substantially narrow or eliminate plaintiffs' claims on these grounds.

12.     The parties also strongly disagreed on the import and meaning of many of the documents produced and witness testimony.  There was no way to predict which interpretations and inferences the Court or a jury would accept.  Indeed, defendants filed four separate motions for summary judgment raising numerous factual and legal arguments on liability and damages.  The Court had yet to rule on these motions when the parties agreed to settle.  Plaintiffs risked a substantial narrowing of their claims in the event the Court accepted defendants' interpretation of the evidence.

13.     In deciding to settle the Litigation, plaintiffs weighed the witness testimony and documents they believed supported the allegations against the testimony of other witnesses and documents that defendants believed undercut those allegations.  All of these issues, and the risks attendant to them, were considered by plaintiffs and their counsel in deciding to settle this action on the agreed terms.

14.     On balance, considering all the circumstances and risks both sides faced were the parties to continue to trial, both plaintiffs and defendants came to the conclusion that settlement on the terms agreed upon was in the best interest of the Class.

15.     Lead Counsel has prosecuted this action on a wholly contingent basis and has advanced or incurred all litigation expenses.  By doing so, Lead Counsel shouldered the risk of an unfavorable result.  Lead Counsel has not yet received any compensation for its effort.

16.     The fee application, which was negotiated ex ante between CalPERS and Coughlin Stoia, for 11.92% of the Settlement Fund is fair both to the Class and Lead Counsel, and warrants approval.  This fee request is significantly less than the typical range of percentage fees awarded in these types of actions and, under the particular facts of this case, is entirely justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.  Both the settlement and the fee request are supported by CalPERS and Alaska Plumbing & Pipefitting Industry Pension Trust ("Alaska").  This is the kind of result envisioned by Congress in enacting the PSLRA and is entitled to significant weight by the Court in awarding fees to counsel.

17.     Lead Counsel seeks none of the expenses it reasonably incurred in prosecuting this complex securities action for the last two and a half years.  Lead Counsel has incurred expenses totaling $3,142,679.27 but its 11.92% fee agreement with CalPERS *includes expenses*.  These expenses include: (1) the substantial fees and expenses of consultants and experts whose services Lead Counsel required in the successful prosecution and resolution of this case; (2) the cost associated with the 55 fact and expert witness depositions that were

conducted, which included court reporter and videographer fees and travel expenses; (3) photocopying, imaging, shipping and managing a database of more than 25 million pages of documents; and (4) online factual and legal research. These expenses were reasonably and necessarily incurred to obtain this successful result.

18.    Also, as allowed under the PSLRA, CalPERS seeks reimbursement for its time and expenses in the amounts of $25,291.10. Lead Plaintiff's investments of time, effort and expenses greatly contributed to the successful result of this Litigation.

19.    The following is a summary of the nature of the Class's claims, the principal events which occurred during the course of this Litigation, and the legal services provided by Lead Counsel.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

20.    This action was brought on behalf of purchasers of UnitedHealth securities during the Class Period, against UnitedHealth and certain of its officers and directors for violations of §§11 and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b), 14(a), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").

21.    Plaintiffs allege that, prior to and throughout the Class Period, UnitedHealth publicly stated that: (i) UnitedHealth granted all stock options at the fair market value on the date of grant; (ii) stock option grants were tied to the Company's performance; (iii) the Company was not required to record a compensation expense related to the grants; (iv) UnitedHealth's financial success was the result of strong operational performance; (v) the Company's financial reports and statements complied with Generally Accepted

Accounting Principles ("GAAP"); and (vi) internal controls were adequately designed and functioning to prevent fraud and manipulation.

22.     The message was communicated to investors in press releases, meetings and conference calls with analysts, SEC filings, and UnitedHealth's 1999-2006 Annual Reports. According to plaintiffs, investors believed this message, as UnitedHealth's stock rose more than $20 to a high of $64.61 per share during the Class Period.

23.     Plaintiffs allege that UnitedHealth's statements concerning the administration and accounting for its stock option plans were false and misleading.  The Company did not grant stock options at fair market value on the date of grant.  Instead, UnitedHealth backdated its stock option grants to a point in time where the Company's stock was trading at a lower price, resulting in instant, risk-free profit to the defendants, as well as other executives and employees, that was not tied to the Company's performance.

24.     GAAP rules required the Company to record a compensation expense for these backdated stock options.  Plaintiffs allege that defendants understood GAAP accounting requirements but nevertheless ignored them.  This rendered the Company's internal controls ineffective and caused the Company to issue false financial statements that understated UnitedHealth's compensation expense, overstates earnings per share and other financial metrics, and resulted in unpaid taxes.

25.     On March 18, 2006, *The Wall Street Journal* published a story analyzing stock option backdating and reporting that many of the grants to former UnitedHealth CEO McGuire occurred on the day that UnitedHealth's stock was at its lowest price for the year.

Subsequently, the Company announced an investigation into its stock option granting practices.  Over the next several days, UnitedHealth's stock price declined.

26.     Throughout April and May 2006, the Company issued a series of partial disclosures, including the existence of an SEC civil investigation.  UnitedHealth publicly admitted "significant deficiencies" in its granting of and accounting for stock options and that it would likely have to restate its financials.  UnitedHealth's stock price suffered further declines upon each disclosure.  On May 5, 2006, the first action captioned *Krause v. UnitedHealth Group, Inc.*, Civ. No. 0:06-cv-01691-JMR-FLN (D. Minn.), was filed in this District.

## III.    HISTORY OF THE ACTION

27.     On July 7, 2006, CalPERS filed a class action complaint against UnitedHealth, McGuire, David J. Lubben ("Lubben"), William G. Spears ("Spears"), and 15 other individual defendants, including Stephen J. Hemsley ("Hemsley"), Patrick J. Erlandson, Robert J. Sheehy, William A. Munsell, Tracy L. Bahl, Lois E. Quam, James A. Johnson, Thomas H. Kean, Mary O. Mundinger, William C. Ballard, Jr., Douglas W. Leatherdale, Gail R. Wilensky, Richard T. Burke, Donna E. Shalala, and Robert L. Ryan.

28.     In all, a total of seven actions involving similar claims were filed in this District:

| CASE NAME | CASE NUMBER | DATE FILED |
|---|---|---|
| *James C. Krause v. UnitedHealth Group, Inc., et al.* | 0:06-cv-01691-JMR-FLN | 05/05/06 |
| *Richard L. Smith v. UnitedHealth Group Inc., et al.* | 0:06-cv-01784-JMR-FLN | 05/15/06 |
| *Archdiocese of Milwaukee Supporting Fund Inc. v. UnitedHealth Group, Inc., et al.* | 0:06-cv-02051-JMR-FLN | 05/19/06 |

| CASE NAME | CASE NUMBER | DATE FILED |
|---|---|---|
| *Ruth Polishook v. UnitedHealth Group Inc., et al.* | 0:06-cv-02228-JMR-FLN | 06/02/06 |
| *James Ziolkowski v. UnitedHealth Group Inc., et al.* | 0:06-cv-02235-JMR-FLN | 06/02/06 |
| *Lisa De La Rosa v. UnitedHealth Group, Inc., et al.* | 0:06-cv-02797-JMR-FLN | June 29, 2006 |
| *California Public Employees' Retirement System v. UnitedHealth Group Inc., et al.* | 0:06-cv-02939-JMR-FLN | July 7, 2006 |

29.     On July 7, 2006, CalPERS moved to consolidate these actions, for its appointment as lead plaintiff and for approval of its selection of Coughlin Stoia as lead counsel.  Docket 30.  Four other applicants also moved to be appointed.  Docket 11, 16, 18, 25.  Yet another applicant sought to create a leadership committee and requested approval of its choice of counsel as committee chair.  Docket 39.  Lead Counsel engaged in substantial briefing on the issue of lead plaintiff, opposing all other motions.  Docket 30-33, 60-62, 76.

30.     On August 14, 2006, the Court consolidated the actions listed in ¶28.  Docket 79.  On September 14, 2006, the Court appointed CalPERS as Lead Plaintiff and approved its choice of Coughlin Stoia as Lead Counsel and Reinhardt Wendorf & Blanchfield as liaison counsel.  Docket 93. After its issuance, Jae R. Lee and M. H. Kim and Neil Zussman filed an appeal of Judge Noel's Order.  Docket 96-104.  The appellants argued that the Court failed to address whether CalPERS was a net seller and failed to apply the correct factors in determining which proposed lead plaintiff had the largest financial interest.  Docket 96.  On October 13, 2006, CalPERS filed a consolidated response to these motions.  Docket 110.  On October 31, 2006, the Court affirmed CalPERS' designation as Lead Plaintiff and Coughlin Stoia as Lead Counsel.  Docket 123.

31.     After an extensive investigation, which included interviewing more than 30 non-party witnesses, on December 8, 2006, CalPERS filed its 178-page Complaint alleging numerous and detailed violations of §§11 and 15 of the Securities Act and §§10(b), 14(a), 20(a) and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder.  Docket 149.

32.     Throughout the entirety of the Litigation, Lead Counsel communicated on a regular basis with plaintiffs regarding the status and direction of all aspects of the case. Additionally, plaintiffs were provided with copies of all significant pleadings and Court Orders filed in the Litigation.  Lead Counsel arranged frequent telephone conferences to update plaintiffs on recent events and rulings, as well as to discuss upcoming motions and issues.  Plaintiffs were also kept apprised of all settlement negotiations with defendants. CalPERS actively participated in settlement negotiations and plaintiffs ultimately approved the settlement.

## IV.     THE LITIGATION

### A.     Defendants' Motions to Dismiss the Complaint

33.     On February 6, 2007, UnitedHealth, McGuire and Spears each moved to dismiss the Complaint.  Docket 177, 182, 187.  Defendants' complex motions ran to more than 100 pages of briefing and raised more than 25 legal issues and sub-issues.  Defendants argued that Lead Plaintiff failed to meet the PSLRA's heightened pleading requirements.  In particular, defendants argued that the Complaint:  (i) failed to specify any false or misleading statements and the reasons why they were false or misleading; (ii) improperly sought liability for statements constituting opinions and beliefs as well as forward-looking statements and statements that constituted "mere puffery"; (iii) failed to attribute any alleged false

statements to any particular defendant; and (iv) improperly alleged that certain statements were false when in fact they contained no material misrepresentations.  Docket 174, 179, 184.

34.     Defendants also argued that the Complaint failed to plead with particularity facts giving rise to a strong inference of scienter because, among other things, Lead Plaintiff: (i) improperly pleaded "collective scienter" rather than pleading scienter with respect to each defendant; (ii) merely alleged that defendants "knew" of their wrongdoing without indicating how they knew; (iii) engaged in impermissible pleading of "fraud by hindsight"; (iv) mischaracterized certain evidence offered in support of Lead Plaintiff's scienter allegations that in fact demonstrated defendants did not act with scienter; and (v) failed to include any allegations that defendants knew or were reckless in not knowing they were violating GAAP accounting principles or that their internal controls were inadequate. Docket 174, 179, 184.

35.     Defendants further argued that Lead Plaintiff failed to establish scienter with regard to insider trading claims because: (i) the timing of defendants' trades was not suspicious; (ii) the Complaint failed to include any facts concerning defendants' prior trading history; and (iii) defendants were not in possession of material information at the time of their stock sales.

36.     With respect to Lead Plaintiff's §14(a) claim, defendants argued that: (i) UnitedHealth's 2002 and 2003 Proxy Statements were time-barred by the three-year statute of limitations; (ii) Lead Plaintiff failed to allege any facts giving rise to a strong inference of negligence; and (iii) Lead Plaintiff could not establish any defect in the proxy

statements.  Defendants also argued that Lead Plaintiff could not prove damages under §11 because UnitedHealth's stock increased in value from the time of the relevant disclosure to the time the Complaint was filed.  Defendants further argued that Lead Plaintiff's §20A claims failed along with the predicate claim for violation of Rule 10b-5.  Docket 174, 179, 184.

37.     Defendants also vigorously argued that plaintiffs had not adequately plead loss causation because:  (i) plaintiffs failed to allege any causal nexus between the misrepresentations and the economic loss; (ii) UnitedHealth's stock price did not fall significantly after the truth was disclosed; and (iii) UnitedHealth's stock price rose following the Class Period.  Docket 174, 179, 184.

38.     On March 23, 2007, Lead Plaintiff filed its omnibus opposition to defendants' various motions to dismiss the Complaint.  Docket 192.  In its 50-page opposition, Lead Plaintiff argued that each of defendants' reasons to dismiss the Complaint was meritless.  Lead Plaintiff argued, *inter alia*, that: (i) it had adequately alleged defendants' false and misleading statements; (ii) those statements were made with the requisite state of mind; and (iii) Lead Plaintiff had met its burden to provide some indication of loss causation as the Company's stock price declined upon disclosures revealing defendants' fraud.  Lead Plaintiff also argued that: (i) the statue of limitations did not bar plaintiffs' §14(a) claim; (ii) defendants' affirmative defenses to plaintiffs' §11 claim were premature at the pleading stage; and (iii) Lead Plaintiff adequately alleged contemporaneous sales for purposes of plaintiffs' §20A claim.  Lead Plaintiff cited extensive legal authorities and made creative arguments in opposition to defendants' motions to dismiss, with Lead Counsel spending

countless hours performing the legal research necessary to draft an effective opposition and satisfy the draconian pleading burden required under the PSLRA.  Docket 192.

39.    On April 23, 2007, the UnitedHealth Defendants filed a reply brief in support of their motion to dismiss the Complaint that McGuire joined.  Docket 195, 197.  On May 31, 2007, the Court heard oral argument on defendants' motions to dismiss.  On June 4, 2007, the Court denied defendants' motions.  *In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623 (D. Minn. June 4, 2007) (Docket 202).  The same day, McGuire requested permission, via a letter, to file a motion to reconsider.  Docket 203.  On June 5, 2007, the Court denied McGuire's request.  Docket 204.

### B.    Lead Plaintiff's Motion for a Preliminary Injunction

40.    On October 27, 2006, Lead Plaintiff filed a motion for a preliminary injunction to enjoin UnitedHealth's former CEO, McGuire, from exercising stock options granted to him by UnitedHealth.  Docket 113.

41.    On November 17, 2006, McGuire filed an opposition, arguing that: (i) Lead Plaintiff had not posted a bond; (ii) a preliminary injunction was inappropriate because adequate legal remedies were available; (iii) McGuire's actions did not support the imminent harm factor; (iv) plaintiffs could not succeed on the merits; and (v) UnitedHealth was capable of satisfying any claims given that liability would be joint and several.  McGuire further argued that he would suffer irreparable harm due to the injunction.  Docket 137.

42.    On November 20, 2006, UnitedHealth and Hemsley filed a response to the motion for a preliminary injunction.  They argued, *inter alia*, that an injunction was

unwarranted because plaintiffs' inability to prove scienter and loss causation rendered the Class unlikely to succeed on any of its claims.  Docket 141.

43.     On November 27, 2006, Lead Plaintiff filed its reply brief in support of the motion for a preliminary injunction.  Docket 144.  The Court heard oral argument on the motion on November 28, 2006.

44.     On November 29, 2006, the Court entered a consent injunction until the earlier of 30 days following a decision by the Company's Special Litigation Committee ("SLC") in a parallel derivative action, or July 30, 2007, whichever occurred earlier.  *In re UnitedHealth Group Inc. S'holder Derivative Litig.*, No. 06-CV-1216(JMR/FLN), 2006 U.S. Dist. LEXIS 90894 (D. Minn. Nov. 29, 2006) (Docket 148).

45.     The SLC's decision concerning the derivative litigation was delayed well beyond July 2007, and the parties engaged in several rounds of briefing concerning the injunction that resulted in a series of Court-approved extensions.

46.     On December 11, 2007, after the SLC issued its decision, Lead Plaintiff immediately filed a motion to extend the preliminary injunction.  Docket 303.  Lead Plaintiff argued that even though the SLC had resolved the derivative litigation, the circumstances warranted an extension.  Docket 304.  Later that day, McGuire filed a letter brief in opposition to Lead Plaintiff's motion arguing that he had already voluntarily surrendered a significant number of stock options, did not retain any benefit due to backdating, and that, given the SLC and SEC judgments, he should not be further enjoined.  Docket 307.

47.     On December 26, 2007, the Court granted Lead Plaintiff's motion to extend the preliminary injunction.  *In re United Health Group Inc. S'holder Derivative Litig.*, No. 06-

CV-1216(JMR/FLN), 2007 U.S. Dist. LEXIS 94616 (D. Minn. Dec. 26, 2007) (Docket 315). On January 2, 2008, the Court formally certified a question to the Minnesota Supreme Court concerning whether the Minnesota business judgment rule prevented the Court from examining the reasonableness of the SLC's decision.  Docket 316.  The Court extended the preliminary injunction pending the Minnesota Supreme Court's answer to the certified question.  Docket 315.

48.     On January 7, 2008, McGuire filed an appeal with the United States Court of Appeals for the Eighth Circuit concerning the District Court's December 12 and 26, 2007 extension of the preliminary injunction.   Docket 317.   *See generally* Docket, *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 08-1142 (8th Cir.).   On February 29, 2008, McGuire filed his opening brief where he argued that the extension of the preliminary injunction was unwarranted and "contrary to law" because the preservation of money damages alone was an insufficient basis for the injunction in the absence of any risk to Class recovery.   On June 23, 2008, Lead Plaintiff filed its response, arguing that plaintiffs maintained an equitable ***and*** monetary interest justifying the continued restraint on McGuire's stock options.  McGuire filed several additional motions with the Eighth Circuit, including an April 16, 2008 motion for expedited review and a May 2, 2008 motion to reinstate an earlier, vacated briefing schedule.  Lead Plaintiff opposed the latter motion and both motions were subsequently denied by the Eighth Circuit on May 1, 2008 and May 21, 2008, respectively.  Additionally, on March 3, 2008, McGuire filed an emergency motion to modify the injunction arguing that the District Court's December 26, 2007 Order required clarification because certain of his stock options, frozen pursuant to the Order, would begin

to expire on April 4, 2008.  Lead Plaintiff filed a response arguing that it was clear from the District Court's Order that the time period for exercise had been tolled.  On April 11, 2008 the Eighth Circuit agreed that the time period remained tolled.

49.     On February 29, 2008, Lead Plaintiff and defendants, among others, filed their opening briefs in the Minnesota Supreme Court.  *See generally* Docket, *In re UnitedHealth Group Inc. PSLRA Litig.*, No. A080114 (Minn.).  Lead Plaintiff argued that the district court should be allowed to scrutinize the terms of a proposed settlement of a shareholder derivative action to ensure its fairness, reasonableness and adequacy.   McGuire, Lubben and UnitedHealth's Board of Directors argued that the Court should only be permitted to inquire whether an SLC was sufficiently independent and acted in good faith in entering into the settlement.

50.     On March 31, 2008, the parties filed responsive briefs.  On April 22, 2008, the Minnesota Supreme Court invited supplemental briefing, which plaintiffs filed on April 29, 2008.   On May 7, 2008 the Supreme Court of Minnesota, sitting *en banc*, heard oral argument and took the matter under advisement.  On August 14, 2008, the court issued its opinion, holding that a court must defer to an SLC's decision to settle a shareholder derivative action as long as the defendant corporation can establish that the SLC was independent and that its investigative procedures and methodologies were adequate, appropriate and pursued in good faith.  *In re United Health Group Inc. S'holder Derivative Litig.*, 754 N.W.2d 544 (Minn. 2008).

51.     The parties agreed to settle the matter prior to oral argument in the Eighth Circuit, which was scheduled for November 13, 2008.

- 18 -

C.    **Lead Plaintiff's Motion for Partial Summary Judgment**

52.    On July 18, 2007, Lead Plaintiff filed a motion for partial summary judgment against UnitedHealth under §11 of the Securities Act. Docket 221. On September 12, 2007, UnitedHealth filed its opposition to Lead Plaintiff's motion, arguing that plaintiffs' motion was improvident as it had not had the opportunity to conduct adequate fact and expert discovery. Defendants also argued that they could demonstrate that the declines in UnitedHealth stock were not attributable to the alleged misstatements but rather to other factors requiring expert analysis and discovery. Defendants also argued that the alleged misleading statements were immaterial because they concerned non-cash expenditures and did not affect the Company's core business operations. Docket 257.

53.    On September 20, 2007, Lead Plaintiff filed a reply in support of its motion. Docket 261. On October 2, 2007, the Court heard oral argument and denied Lead Plaintiff's motion. Docket 263, 266.

D.    **Plaintiffs' Motion for Class Certification**

54.    On November 1, 2007, plaintiffs filed their Motion for Class Certification, seeking the Court's certification of a class comprised of all persons who purchased or otherwise acquired the publicly traded securities of UnitedHealth during the Class Period, including those Class Period purchasers who also held UnitedHealth stock during the 2002, 2003, 2004, 2005 and 2006 UnitedHealth proxy solicitations, and those who acquired UnitedHealth stock in or traceable to the December 20, 2005 merger with PacifiCare. Docket 273.

55.     On February 27, 2008, UnitedHealth and McGuire, Lubben and Spears each filed opposition memoranda to plaintiffs' motion.  Docket 389, 392, 393, 396.  Due to the number of issues defendants raised in opposition to class certification, on March 6, 2008, plaintiffs filed a 30-page reply memorandum in further support of their motion.  Docket 420. Plaintiffs vigorously responded to defendants' arguments that the Class Period should be shortened because defendants' misrepresentations had become fully known to the public in March 2006.  *Id*.  Plaintiffs refuted defendants' arguments that: (i) CalPERS was subject to "unique defenses"; (ii) CalPERS could not trace any shares to the PacifiCare merger in order to sustain its §11 claim; and (iii) Alaska could not be appointed as a class representative because the Court had not appointed it lead plaintiff.  Plaintiffs also had to address defendants' "negative causation" argument that market and industry factors, rather than misrepresentations, caused plaintiffs' losses.  *Id*.

56.     On March 18, 2008, the Court heard oral argument and granted plaintiffs' motion.  Docket 464, 465.

**E.     Fact Discovery**

**1.     Written Discovery to Defendants**

57.     On August 24, 2007, plaintiffs propounded their First Request for Production of Documents Directed to UnitedHealth and the Individual Defendants.  On December 3, 2007, plaintiffs served their Second Request for Production of Documents on UnitedHealth.

58.     On December 18, 2007, plaintiffs also served their First Set of Interrogatories on UnitedHealth and the Individual Defendants.  Additional interrogatories directed to

UnitedHealth were propounded on January 3, 2008 and February 26, 2008.  Plaintiffs also served additional interrogatories on the Individual Defendants on February 26, 2008.

59.    On September 18, 2007, plaintiffs served all defendants with their First Set of Requests for Admission.

60.    Prior to producing the requested discovery, defendants insisted that plaintiffs stipulate to a confidentiality agreement.  The parties engaged in substantial negotiations over the terms of the confidential treatment of documents.  On September 7, 2007, the Court approved the stipulated order.  Docket 256.

61.    The result of the discovery requests set forth in ¶¶57-59, *supra*, culminated in the production of approximately 25 million pages of documents.  Because of the volume of the production, Lead Counsel established a database with an outside vendor that enabled plaintiffs to organize, search and retrieve the documents electronically.  The database was both necessary and costly and also required that more than 15 lawyers and paralegals be trained in the use of the database.

62.    Careful examination and analysis of the documents required a massive effort by teams of attorneys to review the tens of millions of pages made available for plaintiffs' inspection, to analyze and organize the documents, to select the documents that proved plaintiffs' allegations, to identify relevant witnesses, and to work out procedures to ascertain additional documents and information that had not been produced.  Plaintiffs' review and organization of defendants' production was ongoing every day for almost a full year.

## 2.    Depositions

63.    Plaintiffs also conducted approximately 40 depositions of UnitedHealth present and former employees, directors and 30(b)(6) witnesses in just two months in various locations throughout the United States.  Those depositions are set forth as follows:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Amy Jo McEvoy | 01/24/08 | Minneapolis, MN |
| Clint M. Egenes | 02/01/08 | Minneapolis, MN |
| Christopher J. Walsh | 02/04/08 | Minneapolis, MN |
| Patti Zimmerman | 02/05/08 | Minneapolis, MN |
| Mark F. Lindsay | 02/05/08 | Minneapolis, MN |
| Tresa A. King | 02/06/08 | Minneapolis, MN |
| Matthew J. Ladegaard | 02/07/08 | Minneapolis, MN |
| Craig M. Mitchell | 02/08/08 | Minneapolis, MN |
| Gayle M. Cooney | 02/08/08 | Minneapolis, MN |
| John M. Riley | 02/08/08 | Minneapolis, MN |
| Patrick S. Berry | 02/12/08 | Minneapolis, MN |
| John W. Kelly | 02/12/08 | Minneapolis, MN |
| Robert Oberrender | 02/14/08 | Minneapolis, MN |
| John S. Penshorn | 02/14/08 | Minneapolis, MN |
| Robert J. Sheehy | 02/20/08 | Minneapolis, MN |
| Joseph Weissenborn | 02/22/08 | Minneapolis, MN |
| Kimberly S. Arnold | 02/26/08 | Minneapolis, MN |
| Tracy L. Bahl | 02/29/08 | New York, NY |
| Diane L. Flottemesch | 03/07/08 | Naples, FL |
| James A. Johnson | 03/11/08 | Minneapolis, MN |
| Mary O. Mundinger | 03/12/08 | New York, NY |
| Scott E. Theisen | 03/12/08 | Minneapolis, MN |
| Robert Backes | 03/14/08 | New York, NY |
| Robert L. Ryan | 03/14/08 | Minneapolis, MN |

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Gail R. Wilensky | 03/18/08 | Washington, D.C. |
| William A. Munsell | 03/20/08 | Minneapolis, MN |
| Richard T. Burke | 03/20/08 | Phoenix, AZ |
| Thomas Valerius | 03/21/08 | Minneapolis, MN |
| Lois E. Quam | 03/25/08 | Minneapolis, MN |
| Douglas Leatherdale | 03/26/08 | Minneapolis, MN |
| Donna E. Shalala | 03/27/08 | Coral Gables, FL |
| Robert Dapper | 03/28/08 | Minneapolis, MN |
| William Ballard | 03/28/08 | Minneapolis, MN |
| Thomas H. Kean | 03/28/08 | Basking Ridge, NJ |
| Patrick J. Erlandson | 03/27/08 | Minneapolis, MN |
| William G. Spears | 03/27-28/08 | New York, NY |
| Stephen J. Hemsley | 03/31/08 | Minneapolis, MN |
| William W. McGuire | 04/01/08 | Minneapolis, MN |
| David J. Lubben | 05/23/08 | Minneapolis, MN |
| Nancy A. Robertson | 07/11/08 | Minneapolis, MN |

These depositions helped plaintiffs develop evidence: (i) concerning the Company's stock option compensation and accounting practices; (ii) establishing defendants' knowledge of material, non-public facts; and (iii) regarding the kinds of reports and documents UnitedHealth generated and maintained, not only during the regular operation of its business but also during its internal investigation into the Company's stock option granting practices (thereby enabling Lead Counsel to assess the sufficiency of defendants' document productions as well as to request additional documents to prove plaintiffs' case).

64.   In addition, Lead Counsel was required to defend the depositions of nine individuals from CalPERS and Alaska:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Donna Whitford | 01/29/08 | Seattle, WA |
| William P. Sherwood-McGrew | 01/30/08 | Sacramento, CA |
| Carl A. Guidi | 01/31/08 | Sacramento, CA |
| Dan Kiefer | 03/31/08 | Sacramento, CA |
| Mary Cottrill | 04/01/08 | Sacramento, CA |
| Matt Flynn | 04/01/08 | Sacramento, CA |
| Dennis Johnson | 04/01/08 | Sacramento, CA |
| Russell Read | 04/01/08 | Sacramento, CA |
| Christianna Wood | 04/02/08 | New York, NY |

### 3.   Third Party Discovery

65.   Starting on August 24, 2007, plaintiffs began issuing subpoenas for documents to 28 non-parties.  Ultimately, 21 of those non-parties produced responsive documents to plaintiffs.  The document productions from these non-parties alone exceeded 670,000 pages. Lead Counsel reviewed and analyzed all of these documents.

66.   A list of the non-parties subpoenaed by plaintiffs in this action is set forth below:

| PERSON/ENTITY | DATE OF SUBPOENA | RELATIONSHIP |
|---|---|---|
| A.G. Edwards & Sons, Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| Aon Corporation | 12/03/07 | Consultant |
| Aon Consulting | 12/07/07 | Consultant |
| Arthur Andersen LLP | 11/20/07 | Auditor |
| Bear Stearns & Co., Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| The Honorable Kathleen A. Blatz | 01/24/08 | Special Litigation Committee |

- 24 -

| PERSON/ENTITY | DATE OF SUBPOENA | RELATIONSHIP |
|---|---|---|
| CIBC World Markets | 12/18/07 | Investment Banker/ Securities Analyst |
| CitiGroup, Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| Dr. Bradford Cornell | 12/18/07 | Consultant |
| Deloitte & Touche LLP | 08/24/07 | Auditor |
| Dow Jones & Company, Inc. | 12/17/07 | Business News & Information Provider |
| Ernst & Young LLP | 11/20/07 | Auditor |
| FTI Consulting, Inc. | 10/16/07 | Consultant |
| Hewitt Associates LLC | 10/16/07 | Consultant |
| Huron Consulting Group, Inc. | 02/04/08 | Consultant |
| J.P. Morgan Securities, Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| Kekst & Company, Inc. | 02/27/08 | Consultant |
| KPMG | 12/04/07 | Auditor |
| Kroll, Inc. | 12/18/07 | Consultant/Vendor |
| Dr. Erik Lie | 12/18/07 | Academic |
| Morgan Stanley & Co., Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| Morgan Stanley & Co., Inc. | 08/24/08 | Financial Advisor |
| MTS Health Partners, L.P. | 08/24/07 | Financial Advisor |
| Navigant Consulting, Inc. | 02/04/08 | Consultant |
| Simpson Thacher & Bartlett LLP | 10/16/07 | Outside Counsel |
| Spears Grisanti & Brown LLC | 10/16/07 | Financial Advisor to Individual Defendants |
| Stifel, Nicolaus & Co., Inc. | 12/18/07 | Investment Banker/ Securities Analyst |
| The Honorable Edward C. Stringer | 01/24/08 | Special Litigation Committee |
| Thomson Financial, Inc. | 02/20/08 | Consultant |

67.    Lead Counsel engaged in numerous meet-and-confers with most of the subpoenaed non-parties to discuss those non-parties' objections to the subpoenas, to negotiate the scope of the subpoenas and to arrange for the production of responsive documents.  This required extensive coordinated efforts and expenditures of time and money on Lead Counsel's part.

68.    Plaintiffs also conducted nine depositions of non-party fact witnesses in just three weeks, including UnitedHealth's external auditors, their public relations consultant, and market analysts who covered UnitedHealth during the Class Period.  Those depositions are set forth as follows:

| DEPONENT | DATE | DESCRIPTION | LOCATION |
|---|---|---|---|
| Charles Boorady | 03/11/08 | Analyst | New York, NY |
| Thomas E. Roos | 03/19/08 | External Auditor | Minneapolis, MN |
| Christine Arnold | 03/19/08 | Analyst | New York, NY |
| Carl McDonald | 03/24/08 | Analyst | New York, NY |
| John R. Peirson | 03/26/08 | External Auditor | Minneapolis, MN |
| Joshua R. Raskin | 03/27/08 | Analyst | New York, NY |
| Mark D. Albrecht | 03/28/08 | External Auditor | Minneapolis, MN |
| John Thomas Bigalke | 03/31/08 | External Auditor | Orlando, FL |
| Ruth E. Pachman | 04/01/08 | Public Relations | New York, NY |

69.    These depositions enabled plaintiffs to develop their case: (i) concerning loss causation and undermining defendants' defenses to loss causation; (ii) establishing defendants' knowledge of material, non-public facts; (iii) regarding whether certain reports and documents were prepared in connection with external audits and reviews or whether they constituted attorney work product (again, enabling Lead Counsel to assess the sufficiency of defendants' document productions); and (iv) enabling Lead Counsel to undermine defendants' affirmative defenses.

**4.    In-House Forensic Accounting Experts**

70.    In order to conduct effective discovery and prepare for trial, Lead Counsel relied extensively on Coughlin Stoia's in-house forensic accountants.  Andrew J. Rudolph, CPA, CFE, Chris Yurcek, CPA, Keith Mautner, CPA, Terry Koelbl, CPA, Heather Jennette,

CPA, and James Feldman, CPA (collectively, the "Forensic Accountants"), provided the majority of forensic accounting services in this case.

71.     Mr. Rudolph is the National Director of Coughlin Stoia's forensic accounting department, which provides the firm with in-house forensic accounting expertise in connection with securities fraud litigation against national and foreign companies.  He is a Certified Fraud Examiner and a Certified Public Accountant licensed to practice in the state of California.  He is an active member of the American Institute of Certified Public Accountants ("AICPA"), the California Society of Certified Public Accountants, and the Association of Certified Fraud Examiners.  Mr. Rudolph has 20 years of public accounting, consulting and forensic accounting experience, which has included financial fraud investigation, auditor malpractice, auditing and consulting with PricewaterhouseCoopers, business litigation consulting, due diligence investigations and taxation.

72.     Mr. Yurcek is a Director of the firm's forensic accounting department.  He is a Certified Public Accountant licensed to practice in the state of California, and Certified in Financial Forensics ("CFF" designation) by the AICPA.   Mr. Yurcek has over 20 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations, auditing at both national and local CPA firms, complex business litigation, and bankruptcy fraud consulting.  Mr. Yurcek is an active member of the AICPA, the California Society of Certified Public Accountants, and the Association of Certified Fraud Examiners.

73.     Until his departure from the firm in 2008, Mr. Mautner was a Senior Forensic Accountant in the firm's forensic accounting department.   He is a Certified Public

Accountant licensed to practice in the state of California, a Certified Management Accountant, and holds a CFF designation from the AICPA. Mr. Mautner has over 16 years of professional experience in fraud investigation, audit and accounting at a "Big Four" accounting firm, and as a financial officer at a private company. Mr. Mautner is a member of the AICPA, and the California Society of Certified Public Accountants.

74.     Mr. Koelbl is a Manager in the firm's forensic accounting department. He is a Certified Public Accountant licensed to practice in the state of California with over six years of accounting, auditing, and forensic accounting experience. Mr. Koelbl is a Certified Fraud Examiner, holds a CFF certification from the AICPA, and has an MBA. Mr. Koelbl previously worked as an auditor for the accounting firm of Ernst & Young LLP, is a member of the AICPA, California Society of Certified Public Accountants, and the Association of Certified Fraud Examiners.

75.     Ms. Jennette is a Certified Public Accountant licensed to practice in the states of California and New Jersey. She is an active member of the American Institute of Certified Public Accountants, the California Society of Certified Public Accountants, and the Association of Certified Fraud Examiners. Ms. Jennette has over 11 years of accounting and auditing experience, with more than 7 years of experience directly related to the investigation of securities fraud. Ms. Jennette previously worked as an auditor for the accounting firm of Deloitte & Touche LLP.

76.     Mr. Feldman is a Manager in the firm's forensic accounting department. He is a Certified Public Accountant licensed to practice in the states of California and Pennsylvania, has an MBA degree, and holds CFF and Accredited Business Valuation

("ABV") certifications from the AICPA.  Mr. Feldman's professional accounting, auditing and consulting experience spans 26 years, and includes forensic accounting, financial statement and internal auditing, and experience as an adjunct  accounting instructor at the university level.  Mr. Feldman  has worked as an auditor at the Federal Reserve Bank of Philadelphia, and worked in the AICPA's Litigation Services division, where he authored or edited multiple technical accounting articles appearing in various AICPA publications,  and served as a panelist at continuing professional education conferences.

77.     The Forensic Accountants reviewed UnitedHealth's SEC filings as far back as publicly available, and analyzed and catalogued UnitedHealth's stock option practices dating back to 1996.

78.     The Forensic Accountants performed extensive research of authoritative literature and industry trends and practices relating to stock option accounting practices. This information was used with plaintiffs' accounting expert and would be used at trial to demonstrate that accounting rules required defendants to record a compensation expense for their backdated stock options.

79.     The Forensic Accountants also cataloged, reviewed, and analyzed the voluminous productions of accounting related documents produced by UnitedHealth and the Company's auditors, Arthur Andersen LLP ("Andersen") and Deloitte & Touche LLP ("Deloitte").  These reviews were critical to developing evidence in the accounting case. After a detailed review of the auditors' working papers, the Forensic Accountants determined that UnitedHealth had mislead or withheld important information concerning its stock option accounting practices from its auditors.  This information was used in the depositions of

Andersen and Deloitte auditors to successfully attack UnitedHealth's assertion that its auditors knew of and approved the Company's improper stock option accounting.

80.     The Forensic Accountants also assisted in determining the sufficiency of the Company's and auditors' document productions.  They provided evidence that key missing documents existed, assisted counsel in extensive motion practice to obtain these missing documents, and assisted counsel in successfully defeating defendants' abusive privilege claims regarding key audit documentation.

81.     A significant portion of the Forensic Accountants' time was spent assisting and preparing attorneys and the accounting expert witness on accounting issues for depositions and trial.  The Forensic Accountants worked extensively with plaintiffs' expert D. Paul Regan, CPA, in order to assist with his deposition.   Plaintiffs also deposed several accounting, auditing, and finance professionals employed by UnitedHealth, Andersen and Deloitte.  The Forensic Accountants played a critical role in this deposition process.  They identified key deponents, clarified deposition objectives, explained complex audit and accounting principles, selected deposition exhibits, developed extensive deposition outlines, and attended many depositions in order to confer with attorneys in real-time.  As a result, Lead Counsel was more effective at deposition, and elicited significant testimony helpful to plaintiffs.

82.     The Forensic Accountants also reviewed the defendants' accounting expert's reports, evaluated the assertions and theories advanced, and identified portions of his opinions that should be challenged at deposition, or by motion in limine.  They prepared extensive deposition outlines for this witness, selected deposition exhibits, and attended the

deposition.  As a result, plaintiffs believe they significantly narrowed the opinions that the defense expert could credibly advance at trial, and mitigated potentially damaging testimony.

83.     The Forensic Accountants' substantial efforts toward the trial of this case were instrumental in achieving the outstanding settlement of the Litigation.

F.     **Discovery Disputes**

84.     The parties litigated numerous complex discovery disputes during the Litigation.  Prior to filing or responding to motions to compel and other motions, the details of which are outlined below, Lead Counsel spent thousands of hours analyzing documents in an effort to narrow the scope of discovery disputes while still aggressively pursuing the discovery rights of the Class.  Counsel spent many hours preparing for meet-and-confer conferences with defense counsel, conducting those conferences and preparing letters memorializing those conversations.

85.     Due to the number and complexity of the issues raised by disputes over documents and depositions, the parties filed more than 15 motions related to discovery, the vast majority of which were fully briefed, heard and then decided by the Court.  Lead Counsel devoted thousands of hours of time on discovery disputes with defendants and subpoenaed non-parties.

86.     For example, the parties were unable to agree on whether or not certain key documents in this case were privileged.  Plaintiffs argued that certain documents were prepared for purposes of the Company's restatement, while defendants argued they were prepared in anticipation of litigation, rendering them protected attorney work product. Despite several attempts to resolve this issue without Court intervention, on February 15,

2008, plaintiffs filed a motion to compel, arguing that deposition testimony from a senior member of the Company's accounting department revealed that the documents were created to aid the Company in its restatement. Docket 358, 360. On February 25, 2008, defendants opposed, arguing that the documents were prepared by counsel and constituted protected work product. Docket 386. Magistrate Judge Noel ultimately ruled that the documents should be produced. Docket 425.

87. Another heavily-contested discovery issue concerned whether certain interview memoranda that defendants shared with their auditors were protected work product. On April 14, 2008, plaintiffs filed a motion to compel, arguing that the interview memoranda prepared by counsel did not constitute work product because documents and testimony obtained from the auditors revealed that the auditors would have compiled the same information themselves had it not been compiled by UnitedHealth's counsel. Docket 491, 493. On April 21, 2008, defendants filed their opposition, arguing that the Court had already ruled on the matter during the derivative litigation and determined that the memoranda were protected work product. Docket 511. The Court heard oral argument on April 28, 2008 and subsequently ordered defendants to produce the documents. Docket 703.

88. This ruling was heavily disputed and, on June 13, 2008, defendants filed a motion for clarification and on June 18, 2008, filed a formal objection to the Order. Docket 728, 738. Defendants' motion for clarification was fully briefed and awaiting oral argument, and plaintiffs were drafting their response to defendants' objection, when the parties agreed to settle the action.

89.     The parties engaged in numerous additional discovery disputes over their document production, depositions, answers to interrogatories and the adequacy of their privilege logs.  The parties were unable to resolve these disputes informally, necessitating Court intervention.  The contested discovery issues that resulted in motion practice included:

(a)     Defendants' assertion of a reliance on counsel defense and the sufficiency of their answers to plaintiffs' interrogatories concerning the defense (Docket 516, 576, 702);

(b)     Defendants' continued withholding of certain documents that the Court previously ordered produced (Docket 533, 571, 702);

(c)     Defendants' withholding of information related to compensation of their expert witness (Docket 579, 601, 704);

(d)     Defendants' withholding of certain metadata until the close of discovery, preventing plaintiffs from conducting adequate fact and expert discovery concerning key documents (Docket 587, 657, 704);

(e)     Defendant Spears' refusal to provide adequate responses to plaintiffs' interrogatories prior to the close of fact discovery and the deadline for filing non-dispositive motions (Docket 592);

(f)     Plaintiffs' inability to obtain adequate testimony from one of defendants' experts retained in connection with class certification due to his admission that, at the time of his deposition, he had not reviewed the information at issue and his opinion might change once he did review the information (Docket 651, 698);

(g)     Defendants' insistence that plaintiffs produce work performed by their damages expert when retained as a non-testifying consultant (Docket 711, 732, 749); and

(h)     Defendants' insistence that they be permitted to depose seven CalPERS executives and staff, including its Chief Investment Officer and General Counsel (Docket 371, 406, 469).

90.     In addition to the issues culminating in motion practice, the parties engaged in numerous additional discovery disputes that were either resolved without Court intervention or had not proceeded to motion practice at the time the parties agreed to settle the Litigation. However, the foregoing provide several poignant examples of the complexity of the discovery disputes between the parties in this action, how hard fought they were and the lengths plaintiffs were compelled to go to in order to obtain sufficient discovery from defendants.

91.     In addition to disputes with defendants, every non-party served with a subpoena by plaintiffs objected, requiring many hours of attorney time for meet-and-confer. Plaintiffs successfully negotiated with third parties concerning the scope of the documents produced, depositions to be given in this matter and the providing of electronic data, in some cases.

92.     On February 22, 2008, plaintiffs filed a motion to compel the members of the SLC to produce documents.  Docket 378.  Although the SLC produced approximately 34,000 pages of documents to plaintiffs, the SLC withheld numerous documents under a claim of privilege.  In their motion, plaintiffs argued that the withheld documents were not protected by the attorney-client and/or work product doctrine because disclosure to the SLC waived

any such protection.  Docket 380.  On March 10, 2008, the SLC filed its opposition, arguing that the Court had already determined that documents disclosed to the SLC remained protected work product and that documents created by the SLC attorneys also constituted protected work product.  Docket 432.

93.     On March 17, 2008, the Court heard oral argument and denied plaintiffs' motion.  Docket 468.

### G.     Disputes Concerning the Protective Order

94.     There were also extensive negotiations and Court rulings concerning the Protective Order.  After the terms of the Protective Order were established, the parties litigated the issue of which documents were properly covered by the Order.  On May 22, 2008, plaintiffs filed a motion to unseal the record, arguing that UnitedHealth had inappropriately designated all of its documents as "confidential."  Docket 638, 640.  UnitedHealth vigorously opposed plaintiffs' motion.  Docket 695, 701.

95.     On June 10, 2008, the Court granted in part plaintiffs' motion to unseal the record, ordering the parties to unseal their briefs filed in support of dispositive motions and to meet and confer further concerning the exhibits submitted in support of those motions.  Docket 717.  Subsequently, the parties spent numerous hours reviewing the relevant documents and meeting and conferring in an attempt to agree to appropriate confidentiality designations.

96.     The parties were also forced to engage in motion practice concerning attorney-client privilege and work product matters that arose under the Protective Order.  In particular, the Protective Order permitted a producing party to "claw back" any documents

on the basis of privilege if they were inadvertently produced.  The Protective Order provided a mechanism for submitting any such documents to the Court in the event the parties were unable to agree whether the documents were privileged.

97.     On February 20, 2008 and April 14, 2008, plaintiffs submitted two separate sets of documents to the Court for a determination on defendants' privilege claims.  Docket 370, 488.  The Court heard oral argument on those submissions on March 17, 2008 and April 28, 2008, respectively.   Docket 461, 572.   As to those submission, the Court found approximately half of the documents were not privileged.  Docket 477, 703.

### H.     Informal Interviews

98.     In connection with its investigation of this case, Lead Counsel, or persons acting on its behalf, expended significant time and effort identifying, locating and contacting numerous individuals, including former UnitedHealth employees who it believed had relevant information supporting plaintiffs' allegations, and conducting interviews of many such persons.  More than 30 such persons were interviewed.

### I.     Expert Witness Discovery for Trial

99.     To assist Lead Counsel in investigating and proving the complex issues involved in this matter, including the Class's damages, the services of certain consultants and experts were required.

100.     Plaintiffs designated Professor Linda Allen as their damages expert.  Dr. Allen provided a 57-page detailed expert report analyzing the damages resulting from defendants' conduct over the course of the Class Period.  The report explains her use of "event study" methodology to examine how defendants' false public statements affected UnitedHealth's

stock price.  Professor Allen and her staff spent numerous hours preparing her report, as well as several days preparing for and providing deposition testimony.  Professor Allen and her staff also spent significant time assisting Lead Counsel to analyze defendants' expert reports and preparing counsel for depositions.  Dr. Allen is a highly respected and published professional.

101.    Plaintiffs also designated a Certified Public Accountant and Certified Fraud Examiner, D. Paul Regan, as their expert on GAAP accounting matters related to UnitedHealth's stock option accounting practices between 1994-2006.  Mr. Regan's 86-page report required the review and analysis of public information and documents produced by defendants and third parties, and the application of his vast knowledge concerning accounting, auditing and forensic accounting matters.  Additionally, Mr. Regan spent several hours with counsel preparing for and testifying at his deposition.  Mr. Regan and his staff also assisted Lead Counsel to analyze defendants' expert reports and to prepare counsel for the depositions and cross-examinations of defendants' experts.  Mr. Regan is a highly respected CPA and CFE who has worked on more than 500 complex litigation matters and has been serving on the California Litigation Services Steering Committee for almost 20 years.

102.    Plaintiffs also retained Brian T. Foley as their expert on executive compensation.    Mr. Foley submitted an 82-page detailed report which analyzed: (i) UnitedHealth's stock option granting practices and policies and the benefits of those practices to the Individual Defendants; (ii) the Company's public statements; (iii) conflicts of interest between the Company's directors and executives; and (iv) the impact of certain state

regulations on the propriety of defendants' practices.  Mr. Foley's analysis required the review of thousands of pages of UnitedHealth internal documents.  Mr. Foley is a highly respected consultant on senior executive compensation and related corporate governance issues.  Mr. Foley has advised outside investor groups, boards of directors, compensation committees and executives at large publicly traded corporations for more than 30 years. Mr. Foley also spent numerous hours preparing for and attending his deposition and assisting Lead Counsel in analyzing defendants' expert reports and preparing counsel for depositions.

103.    Plaintiffs also retained and designated Rusty Sargent as their expert on metadata.  Mr. Sargent provided a 26-page expert report addressing the meaning of metadata associated with certain documents produced by defendants that purported to approve stock option grants.  Mr. Sargent has 15 years of experience in computer forensics, including spending more than 10 years working in the San Diego Regional Computer Forensics Laboratory which became the model for the FBI's national program for computer forensics. Mr. Sargent has taught computer forensic courses for the FBI in Quantico, Virginia.  Mr. Sargent also assisted Lead Counsel in preparing counsel for the depositions of defendants' 30(b)(6) witness concerning metadata.

104.    The chart below outlines the date and place of all the expert witness depositions taken, or defended, by plaintiffs:

| DEPONENT | DATE | LOCATION |
| --- | --- | --- |
| William H. Beaver<br>Defendants' Expert | 04/15/08 | San Francisco, CA |
| Colin C. Blaydon<br>Defendants' Expert | 04/23/08 | New York, NY |
| Timothy J. Nantell<br>Defendants' Expert | 04/25/08 | Minneapolis, MN |

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Michael P. Dooley<br>Defendants' Expert | 04/25/08 | Charlotte, VA |
| Barry J. Epstein<br>Defendants' Expert | 04/28/08 | Chicago, IL |
| Brian T. Foley<br>Plaintiffs' Expert | 04/30/08 | San Diego, CA |
| D. Paul Regan<br>Plaintiffs' Expert | 05/01/08 | San Diego, CA |
| Laura T. Starks<br>Defendants' Expert | 05/07/08 | Austin, TX |
| Linda Allen<br>Plaintiffs' Expert | 05/16/08 | New York, NY |
| Christopher M. James<br>Defendants' Expert | 05/19/08 | New York, NY |

**J.     The Fruits of Plaintiffs' Discovery Efforts**

105.    The evidence developed by Lead Counsel in discovery supported plaintiffs'

allegations that UnitedHealth was improperly granting backdated stock options and failing to

record the required compensation expense in violation of GAAP.

106.    As demonstrated in plaintiffs' opposition to defendants' motions for summary

judgment, defendants' public statements were materially false.  Contrary to their public

representations, defendants adhered to a company-wide policy of issuing stock options at the

lowest grant date in a given quarter – which could only be determined with hindsight.

Internally, employees referred to backdated grants as "look-back grant dates."  In order to

conceal the scheme, defendants created certain approval documents that purported to

approve stock option grants on the grant date.  Metadata associated with these approval

documents revealed that they were not finalized until well after the grant date.  Regardless,

- 39 -

the documents were backdated to correspond to the chosen grant date and UnitedHealth officers and directors executed these documents in spite of the incorrect date.

107.   The evidence presented in opposition to defendants' summary judgment motions revealed that UnitedHealth's highest-ranking officers carried out the backdating scheme.  These officers were primarily responsible for approving mass grants and selecting the strike price for stock options granted to UnitedHealth employees.  They routinely signed or approved the signing of backdated certificates purporting to approve the grants.  Several officers had significant accounting and audit experience from prior employment with top auditing firms, including Andersen.  Despite any awareness of stock option accounting rules derived from such work experience, defendants continued to offer backdated stock options without recording a compensation expense in connection with backdated grants.

108.   The evidence submitted in connection with plaintiffs' opposition to defendants' summary judgment motions revealed that defendants also understood the inherent value conferred upon the grantees of backdated stock options.  In September 1999, UnitedHealth's stock price declined dramatically, placing many previously granted options "underwater."  In response, on October 22, 1999, defendants arranged to suspend these previous grants and issue new options at a lower price, backdated to October 13, 1999.  The Company failed to record a compensation expense for this grant.  In 2000, the Company chose to unfreeze the suspended options granted prior to October 1999.  Although defendants understood that "[t]his reactivated vesting" functioned substantially like the "issuance of new options" and a compensation expense should be recorded, the Company did not record an expense for this grant either.

109.     Internal e-mails demonstrated that UnitedHealth's Legal and Accounting Departments knew that backdating was improper and that UnitedHealth's policies should be reformed.   Unlike the majority of UnitedHealth's stock option grants which obscured the backdated nature of the grant, a few grants were backdated on their face.   Internal e-mails and documents revealed that these grants were a frequent source of concern for the Company's Accounting and Tax Departments who knew that compensation expense should have been but was not recorded.

110.     Beginning in 2002, the SEC altered its reporting requirements for stock options granted to Section 16 officers.   The new rules required public companies, including UnitedHealth, to report stock option grants to these officers within two days of the grant, throwing a wrench in defendants' scheme.   Regardless, defendants continued to backdate grants to non-insiders and even continued to backdate grants to Section 16 officers by a day or two.   Just prior to the enactment of these new SEC reporting requirements, UnitedHealth substantially backdated one last grant to its insiders.   An e-mail generated in response to the new rules revealed that UnitedHealth's insiders were unhappy about the change.

111.     The evidence presented in opposition to defendants' summary judgment motions revealed that not only were UnitedHealth's officers and executives involved in the backdating scheme, but they knew that their practices were inappropriate.   The Company's Investor Relations Department was specifically warned not to disclose these backdating practices to the public.   Docket 703.   As early as 1991, UnitedHealth's in-house counsel surmised that inappropriate backdating may be taking place.   Employees in UnitedHealth's Accounting Department even attempted to change the Company's backdating policies.

- 41 -

112.    In order to conceal the unrecorded compensation expense from their external auditors, defendants falsely represented to their auditors that members of their Accounting Department reviewed each option grant and ensured the accounting was correct.  On one occasion, the Company was concerned about revealing to its auditors, Deloitte & Touche LLP, that it had chosen a grant date and price but had yet to choose the recipients of the grant and the number of options per recipient.

113.    On November 11, 2006, UnitedHealth announced that as a result of the Company's historic stock option practices, the Company would be restating its 1994-2005 fiscal year financial statements as well as its financial statements for the quarters ending March 31 and June 30, 2006.  In order to prepare the restatement, UnitedHealth compiled stock option grant binders consisting of e-mails and other documents that evidenced the process for each grant.  The Company determined that nearly every grant had been inappropriately backdated and resulted in compensation expense.  Contrary to defendants' public statements during and prior to the Class Period, UnitedHealth was required to record compensation expense amounting to more than $1.5 billion for the backdated options issued during the restatement time period.

### K.    Summary Judgment and Related Evidentiary Motions

114.    On April 21, 2008, defendants filed four separate motions for summary judgment.  Docket 506, 513, 524, 546.  All of the defendants strenuously argued that plaintiffs' claims failed as a matter of law because plaintiffs' alleged "corrective disclosures" did not reveal that defendants' prior representations were false, but simply repeated information the market already knew.  Defendants argued that even if a corrective disclosure

was issued: (i) UnitedHealth's stock suffered minimal decline; (ii) plaintiffs failed to eliminate portions of any stock price declines that were not attributable to the alleged misrepresentations; and (iii) UnitedHealth's stock price recovered quickly from any such declines. Defendants also argued that plaintiffs' §10(b) claims were barred by the statute of limitations.

115.    As for any remaining misrepresentations, defendants argued that plaintiffs could not establish scienter as to several defendants who had no responsibility for stock option accounting or for reviewing and approving UnitedHealth's SEC filings. Defendants further argued that plaintiffs could not establish a §11 claim because: (i) CalPERS' shares could not be properly traced to the merger between UnitedHealth and PacifiCare; (ii) defendants had an affirmative defense of "negative causation"; and (iii) in any event, UnitedHealth's outside directors could not be held liable because they conducted adequate due diligence and reasonably relied on information obtained from others. Docket 508, 526, 531, 548.

116.    Defendants argued that plaintiffs' §14(a) claim was time-barred and that plaintiffs could prove neither transaction causation nor that UnitedHealth's outside directors were negligent. McGuire also argued that Minnesota law permitted backdating of stock options and that he appropriately relied on his accounting staff and external auditors. McGuire also argued that he could not be held liable for violation of §10(b) or §20A based on his February 2006 stock sale because he was unaware of the March 2006 *Wall Street Journal* article at the time he sold. Docket 508, 526, 531, 548.

- 43 -

117.   On May 14, 2008, plaintiffs filed their opposition to defendants' motions for summary judgment.  Docket 610.  In support, plaintiffs filed more than 7,000 pages of documentary evidence and deposition testimony refuting defendants' arguments.  Docket 615.  Moreover, plaintiffs' expert witnesses also provided detailed declarations refuting defendants' evidence and arguments.  Docket 612-614.

118.   On May 29, 2008, plaintiffs filed a supplemental opposition to defendants' motions for summary judgment, offering evidence to demonstrate that Lubben acted with scienter.  Docket 669.

119.   Also on April 21, 2008, in connection with their motions for summary judgment, UnitedHealth, joined by McGuire, filed a motion to exclude the testimony of plaintiffs' expert Linda Allen under *Daubert*.  Docket 538, 541.  Among other things, defendants argued that Professor Allen's methodology was unreliable because it had not been tested, subjected to peer review, employed by any economist or financial professional and was designed solely for litigation purposes.  Docket 540.  Defendants also argued that Professor Allen's event study improperly assessed damages for stock price declines that were unrelated to the fraud.

120.   On May 27, 2008, plaintiffs filed their opposition to defendants' motion.  Docket 643.  Plaintiffs argued that Professor Allen properly removed stock declines unrelated to the fraud when assessing damages.  Plaintiffs argued that Professor Allen's damages model has been published in peer-reviewed journals, has been relied on by professional economists and was developed during Professor Allen's academic research.

Plaintiffs further argued that defendants' motion failed regardless, because their arguments only attacked the credibility of Professor Allen's opinion, not its admissibility. *Id.*

121.   On May 30, 2008, defendants filed a reply brief addressing plaintiffs' arguments.  Docket 676, 681.

122.   The parties settled the Litigation before the Court heard oral argument on defendants' summary judgment motions and the motion to exclude Professor Allen's testimony.

### L.   Trial Preparation

123.   Lead Counsel spent several months preparing for trial.  It is difficult to quantify Lead Counsel's trial preparation efforts, which included not only all the items discussed in the preceding sections, but also hours of analyzing issues specifically relevant to trial.

124.   Lead Counsel not only conducted extensive document review during earlier stages of the Litigation, but also, after the close of fact and expert discovery, began reviewing documents that defendants produced after the prescribed discovery period.  Plaintiffs reviewed tens of thousands of pages of documents to determine whether they should be used as exhibits at trial.  Lead Counsel created lengthy, detailed exhibit lists, identifying thousands of documents that supported plaintiffs' allegations that might be utilized at trial.  Lead Counsel also negotiated an agreement with defendants to establish procedures for stipulating to the authenticity of anticipated trial exhibits.

125.   Lead Counsel's trial preparation also involved extensive document review and selection of exhibits relevant to particular witnesses.  For many of the witnesses anticipated

to be called at trial, Lead Counsel reviewed the witness' deposition testimony, the testimony of other witnesses relevant to that witness' testimony, the deposition exhibits presented to that witness, and exhibits listed on plaintiffs' trial exhibit list that were not shown to the witness at his or her deposition but might be relevant to their trial testimony. Lead Counsel prepared more than 50 witness files for witnesses anticipated to be called at trial.

126.    As discussed in greater detail above, Lead Counsel conducted extensive expert discovery in preparation for trial, including (i) preparing for, taking and defending the depositions of nine expert witnesses and (ii) opposing defendants' motion to exclude the testimony of plaintiffs' damages expert, Professor Linda Allen.

127.    Lead Counsel also conducted several in-depth meetings to discuss both trial logistics and trial strategy. Teams of trial lawyers from Coughlin Stoia, and support staff and information technology personnel met to discuss these matters, including the logistics involved with relocating the team to Minneapolis to prepare for and conduct trial. Lead Counsel's information technology department began preparing a trial database that included videotaped depositions anticipated to be used at trial.

## V.    THE STRENGTHS AND WEAKNESSES OF THE CASE

128.    While plaintiffs believed that defendants' misrepresentations were materially false and made with the requisite scienter, plaintiffs were also aware that defendants had counter evidence, including several statute of limitations defenses and the difficulty of proving defendants knowingly or recklessly violated complex GAAP stock option accounting rules. Disputed issues of causation and damages also posed a substantial risk to plaintiffs' case. Defendants made a strong argument that several of UnitedHealth's stock

declines were not attributable to the fraud because all of the relevant information concerning defendants' fraud had previously been disclosed.

129.    As noted above, plaintiffs took into consideration that establishing defendants' §10(b) liability for the remaining false statement required proof not only that the statement was false or misleading but that defendants made the statement with actual knowledge it was false or misleading.  This already daunting burden of proof was made even more difficult for plaintiffs given that the stock option accounting rules were complex and defendants' refractions evaded detection by even their own auditors.

130.    Additionally, plaintiffs considered defendants' aggressive arguments on loss causation and damages.  Defendants mounted several challenges and proffered three expert opinions that attacked Professor Allen's damages report.   Proof of damages required plaintiffs to demonstrate not only that UnitedHealth's stock price dropped upon disclosures related to the fraud, but that each disclosure revealed significant, new information concerning defendants' fraudulent scheme.  Given that news of defendants' stock option backdating scheme first reached the market in March 2006, plaintiffs were challenged to argue that announcements concerning the fraud in mid-May 2006 caused UnitedHealth's share price to decline.

## VI.    SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

131.    The parties began settlement discussions in the summer of 2007, before Anthony Piazza, an experienced mediator in securities cases.  At the mediator's direction, the parties submitted comprehensive mediation statements and preliminary damages studies. Counsel for all parties and insurers attended the mediation, including CalPERS' General

Counsel, Peter Mixon, and UnitedHealth's Chief Legal Officer, Thomas Strickland. During the mediation, the parties gave aggressive, detailed, and thoughtful presentations on the perceived strengths and weakness of their respective cases. Although the first attempt at mediation was unsuccessful, the parties agreed to meet again later in the month. Despite continued good-faith efforts, however, the parties were unable to resolve the matter. Settlement discussions broke down in September and the parties intensified discovery. Settlement discussions resumed in early 2008 and, at that time, the parties agreed to meet with the Honorable Layn R. Phillips (Ret.) and the Honorable Daniel Weinstein (Ret.). After two days of mediation, negotiations again collapsed with no date for resumption of talks.

132.    In June 2008, defendants' motions for summary judgment were fully briefed and the parties were awaiting oral argument. Simultaneously, the parties were engaged in intensive meet-and-confer negotiations concerning documents that were filed under seal and that plaintiffs argued should be unsealed. Additionally, a hearing was scheduled to address defendants' motion for clarification of a prior Court order that required them to produce certain documents they firmly believed were protected attorney work product.

133.    At this time, the parties agreed to make another attempt to resolve the Litigation. Plaintiffs and the UnitedHealth Defendants, without McGuire and Lubben, recommenced settlement talks. This time, counsel for the parties engaged in face-to-face negotiations. Counsel for the parties – including CalPERS' General Counsel and UnitedHealth's Chief Legal Officer – met several times during June. On July 2, 2008, after lengthy and often contentious rounds of negotiations, the Company and all Individual Defendants except McGuire and Lubben reached an agreement-in-principle with Lead

Plaintiff – less than three months before the scheduled trial date.  As described in further detail below, the agreement-in-principle included an $895 million cash payment and certain corporate governance reforms, which were negotiated exclusively by CalPERS and its counsel and the Company and its counsel.

134.   On July 2, 2008, the parties advised the Court of the tentative settlement. Shortly thereafter, plaintiffs began concerted settlement talks with McGuire and Lubben.  On September 10, 2008, after two months of negotiation, plaintiffs settled in principle with both McGuire and Lubben.

135.   Over the next two and a half months, the parties worked diligently to document the settlement and prepare preliminary approval papers – including hashing out a very complex Stipulation of Settlement, a process that was ***extremely difficult*** and frequently nearly fatal to the agreement-in-principle.  On November 24, 2008, the parties presented the preliminary approval papers to the Court.  Docket 787-792.  On December 18, 2008, the Court held a preliminary approval hearing and granted preliminary approval of the settlement as well as the form and manner of notice of the settlement to the Class.  Docket 801.

136.   The settlement agreement provides for a combined $950,500,000 payment by defendants.  In addition, McGuire agreed to surrender 3,675,000 stock options granted to him between 2003 and 2005.

137.   UnitedHealth further agreed to undertake certain corporate governance changes.  UnitedHealth's landmark corporate governance changes – negotiated ***exclusively*** by Lead Counsel – are summarized as follows:

(a)     ***Shareowner-Nominated Director***.  UnitedHealth agrees to establish a procedure, the result of which shall be that at least one nominee for the position of director shall be a shareowner-nominated candidate.

(b)     ***Lead Independent Director***.  UnitedHealth agrees to amend its bylaws to provide that if the Chairman of the Board does not qualify as an Independent Director, a Lead Independent Director shall be elected annually.

(c)     ***Independence Standards***.  UnitedHealth agrees to enhance standards for directors to qualify as independent.

(d)     ***Executive Compensation***.  The Company agrees that cash incentive compensation will be measured by at least two performance metrics and will consider the performance of the Company in comparison to its peers in awarding such incentive compensation.

(e)     ***Mandatory Holdings Period***.  UnitedHealth agrees to a mandatory holding period for Section 16 officers equal to one-third of net shares acquired via an option exercise at least one year after exercise of the option.

(f)     ***Other Reforms***.  The Company agrees that no members of its Board of Directors may sit on more than three additional public company boards (with a grandfather clause for one of its current directors) and the CEO may sit on no more than one other board.

(g)     In addition, the Company will retain for at least five years a number of governance changes that it had previously implemented, including a declassified board, majority voting in uncontested director elections, and others.  The corporate governance changes obtained by Lead Plaintiff are ground-breaking.

138.    Contrary to the representations by derivative counsel, it did not obtain *any* of these reforms.  All of them were negotiated and obtained solely by the efforts of Lead Plaintiff and Lead Counsel.

139.    The Settlement is a result of vigorous arm's-length negotiations.  In Lead Counsel's judgment, the compromise embodied in the Stipulation of Settlement represents an extremely successful resolution of a very complex class action.

## VII.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

140.    Plaintiffs believe they would have prevailed on the merits at trial.  Defendants were just as adamant that plaintiffs would not have.  There was a very real risk that plaintiffs would not have convinced a jury that defendants acted with scienter or that plaintiffs' case was *Dura*-compliant.  Moreover, given that the Court had not yet ruled on defendants' motions for summary judgment or the motion to exclude Professor Allen's testimony, plaintiffs' ability to introduce evidence at trial to establish causation and damages was uncertain.

141.    Having considered the foregoing, and evaluating defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed settlement of this matter before this Court is fair, reasonable and adequate, and in the best interest of the Class.

## VIII.  THE PLAN OF ALLOCATION

142.    On December 18, 2008, this Court granted preliminary approval and plaintiffs' form and manner of notice.  Pursuant to the Court's Order and as set forth in the Notice of

Pendency and Settlement of Class Action, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a valid Proof of Claim and Release forms postmarked on or before April 22, 2009.  Beginning on December 29, 2008, the Notice of Pendency and Settlement of Class Action was mailed to more than 685,000 individuals, brokers, institutions and nominees, and the summary notice appeared in *The Wall Street Journal* on December 29, 2008 and January 5, 2009, and *Investor's Business Daily* on December 30, 2008 and January 6, 2009.  The Net Settlement Fund shall be distributed according to the Plan of Allocation.

143.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit timely, valid Proof of Claim and Release forms.

144.    The Proposed Plan of Allocation provides:

(a)    The Net Settlement Fund will be distributed to Class Members who submit valid and timely Proof of Claim and Release forms ("Authorized Claimants") under the Plan of Allocation.

(b)    To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below.  If, however the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants.  Payment in this manner shall be deemed conclusive against all Authorized Claimants.

- 52 -

(c)     For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel has consulted with its damage consultants and the Plan of Allocation reflects an assessment of the damages that it believes could have been recovered as among Class Members had Lead Plaintiffs prevailed at trial.

(d)     A "Claim" will be calculated as follows:

### *Section 10(b) Claims for Common Stock*

1.     For shares of UnitedHealth common stock purchased, or acquired, during any of the inflation periods shown below in Table 1, and

(a)     sold within the same purchase period, the claim per share is zero;

(b)     sold in a subsequent purchase period, the claim per share is the lesser of (i) the purchase price per share less the sales price per share, or (ii) the computed inflation per share at time of purchase less the computed inflation per share at time of sale, or (iii) the purchase price per share less $46.41;

(c)     retained at the end of May 17, 2006, the claim per share is the lesser of (i) the purchase price per share less $46.41, or (ii) the computed inflation per share at the time of purchase.

### *TABLE 1*

Note:  Inflation amounts have been adjusted to reflect the Company's 2-for-1 stock split on May 31, 2005.

| Period | Purchase/Sale | Percent Inflation Per Share (*) |
|--------|---------------|--------------------------------|
| 1 | 01/20/05-04/16/06 | 26.75% |
| 2 | 04/17/06 | 23.49% |

| Period | Purchase/Sale | Percent Inflation Per Share (*) |
|--------|---------------|--------------------------------|
| 3 | 04/18/06-05/01/06 | 18.21% |
| 4 | 05/02/06 | 15.38% |
| 5 | 05/03/06-05/07/06 | 11.48% |
| 6 | 05/08/06 | 8.65% |
| 7 | 05/09/06-05/10/06 | 5.71% |
| 8 | 05/11/06-05/17/06 | 3.00% |

\* The inflation per share in dollar terms is computed by multiplying the inflation percentage that corresponds to the transaction dates of Class Period purchases and sales by the actual price per share paid and/or received.

### Section 11 Claim for Shares Issued in Connection with the Company's Acquisition of PacifiCare

1.      For UnitedHealth shares issued in connection with the acquisition of PacifiCare, and

(a)      sold prior to May 6, 2006, the claim per share is $63.06 less the sales price per share;

(b)      retained at the end of, or, sold on or after May 5, 2006, the claim per share is the lesser of (i) $63.06 less the sales price per share or, (ii)  $63.06 less $46.39.

### UnitedHealth Notes

### 3% Convertible Subordinated Debentures (Originally Issued by PacifiCare)

1.      For UnitedHealth 3% Debentures acquired pursuant to PacifiCare's December 2005 merger with UnitedHealth and subsequently converted into UnitedHealth common stock prior to May 6, 2006, and

(a)      sold prior to May 6, 2006, the claim per acquired share is the acquisition price less the sales price;

- 54 -

(b)      retained at the end of, or, sold on or after May 5, 2006,

the claim per acquired share is the lesser of (i) the acquisition price less

the sales price per share or, (ii)  $63.06 less $46.39.

**Note:** For purposes of calculating a claim for UnitedHealth common stock acquired through conversion, the acquisition price shall be equal to the closing price on the date the shares were acquired.

2.      For UnitedHealth 3% Debentures acquired pursuant to

PacifiCare's December 2005 merger with UnitedHealth and held through May

6, 2006, the claim per debenture shall be zero.

### 5.2% Due 1/17/07 Cusip: 91324PAD4

1.      For UnitedHealth 5.2% Notes purchased from January 20, 2005

through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the

purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note

shall be the purchase price less $998.40.

### 3.375% Due 8/15/07 Cusip: 91324PAJ1

1.      For UnitedHealth 3.375% Notes purchased from January 20,

2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the

purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note

shall be the purchase price less $975.50.

### *3.3% Due 1/30/08 Cusip: 91324PAF9*

1.      For UnitedHealth 3.3% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $966.60.

### *3.75% Due 2/10/09 Cusip: 91324PAG7*

1.      For UnitedHealth 3.75% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $954.80.

### *Floating Rate Due 3/09 Cusip: 91324PAN2*

1.      For UnitedHealth floating rate Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $999.41.

### *4.125% Due 8/15/09 Cusip: 91324PAK8*

1.      For UnitedHealth 4.125% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $957.90.

### *5.25% Due 3/15/11 Cusip: 91324PAP7*

1.      For UnitedHealth 5.25% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $982.00.

### *4.875% Due 4/1/13 Cusip: 91324PAE2*

1.      For UnitedHealth 4.875% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $947.80.

### *4.75% Due 2/10/14 Cusip: 91324PAH5*

1.     For UnitedHealth 4.75% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)     sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)     retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $928.80.

### *5.0% Due 8/15/14 Cusip: 91324PAL6*

1.     For UnitedHealth 5.0% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)     sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)     retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $940.60.

### *4.875% Due 3/15/15 Cusip: 91324PAM4*

1.     For UnitedHealth 4.875% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)     sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)     retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $921.80.

### *5.375% Due 3/15/16 Cusip: 91324PAQ5*

1.      For UnitedHealth 5.375% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $951.80.

### *5.8% Due 3/15/36 Cusip: 91324PAR3*

1.      For UnitedHealth 5.8% Notes purchased from January 20, 2005 through May 17, 2006, and

(a)      sold prior to May 18, 2006, the claim per Note is the purchase price less the sales price;

(b)      retained at the end of May 17, 2006, the claim per Note shall be the purchase price less $899.70.

**Note:** The recovery for the Notes shall not exceed 3% of the Net Settlement Fund.

### *Call Options*

1.      For call options on UnitedHealth common stock purchased from January 20, 2005 through May 17, 2006, and

(a)      ***owned*** at the end of one of the following dates: 04/16/06, 04/17/06, 05/01/06, 05/02/06, 05/07/06, 05/08/06, 05/10/06, or 05/17/06, the claim per call option is the difference between the price

paid for the call option less the proceeds received upon the settlement of the call option contract;

(b)    ***not owned*** at the end of one of the following dates: 04/16/06, 04/17/06, 05/01/06, 05/02/06, 05/07/06, 05/08/06, 05/10/06, or 05/17/06, the claim per call option is $0.

2.    For call options on UnitedHealth common stock ***written from January 20, 2005 through May 17, 2006***, the claim per call option is $0.

## *Put Options*

1.    For put options on UnitedHealth common stock written from January 20, 2005 through May 17, 2006, and

(a)    ***held*** at the end of one of the following dates:  04/16/06, 04/17/06, 05/01/06, 05/02/06, 05/07/06, 05/08/06, 05/10/06, or 05/17/06, the claim per put option is the difference between the price paid upon settlement of the put option contract less the initial proceeds received upon the sale of the put option contract;

(b)    ***not held*** at the end of one of the following dates: 04/16/06, 04/17/06, 05/01/06, 05/02/06, 05/07/06, 05/08/06, 05/10/06, or 05/17/06, the claim per put option is $0.

2.    For put options on UnitedHealth common stock ***purchased from January 20, 2005 through May 17, 2006***, the claim per put option is $0.

**Note:** In the case the option was exercised for UnitedHealth common stock, the amount paid, or proceeds received, upon the settlement of the option contract equals the intrinsic value of the option using United Health common stock's closing price on the date the option was exercised.

> **Note:** The combined recovery for the Call Options and Put Options shall not exceed 2% of the Net Settlement Fund. The date of purchase or sale is the "contract" or "trade" date as distinguished from the "settlement" date.

145.    For Class Members who held UnitedHealth securities at the beginning of the Class Period or made multiple purchases or other acquisitions or sales during the Class Period, the first-in, first-out ("FIFO") method will be applied to such holdings, purchases and sales for purposes of calculating a claim. Under the FIFO method, sales of shares during the Class Period will be matched, in chronological order, first against shares held at the beginning of the Class Period. The remaining sales of shares during the Class Period will then be matched, in chronological order, against shares purchased during the Class Period.

146.    A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if a Class Member had a net loss, after all profits from transactions in UnitedHealth securities during the Class Period are subtracted from all losses. However, the proceeds from sales of securities which have been matched against securities held at the beginning of the Class Period will not be used in the calculation of such net loss. No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00. The Court has reserved jurisdiction to allow, disallow or adjust the claim of any Class Member on equitable grounds.

147.    Payment pursuant to the Plan of Allocation set forth above shall be conclusive against all Authorized Claimants. No Person shall have any claim against Lead Counsel or any claims administrator or defendants or other Person designated by Lead Counsel or defendants or defendants' counsel based on distributions made substantially in accordance with the Stipulation and the settlement contained therein, the Plan of Allocation, or further

orders of the Court. All Class Members who fail to complete and file a valid and timely

Proof of Claim and Release form shall be barred from participating in distributions from the

Net Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound

by all of the terms of the Stipulation, including the terms of any judgment entered and the

releases given.

_____
RAMZI ABADOU

State of California
County of San Diego

Subscribed and sworn to (or affirmed) before me, this 28th day of January, 2009, by
Ramzi Abadou, proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

Signature: _____

Seal:

> JACLYN STARK
> COMM. # 1690996
> NOTARY PUBLIC-CALIFORNIA
> SAN DIEGO COUNTY
> MY COMM. EXP. SEPT. 1, 2010

S:\Settlement\United Healthcare.set\AFF ABADOU FINAL APPROVAL 00057014.doc