UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re UNITEDHEALTH GROUP INCORPORATED PSLRA LITIGATION | ) ) ) | Civ. No. 0:06-cv-01691-JMR-FLN CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) ) | |

EXPERT REPORT OF PROFESSOR CHARLES SILVER CONCERNING THE
REASONABLENESS OF CLASS COUNSEL'S REQUEST FOR AN AWARD OF
ATTORNEYS' FEES

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re UnitedHealth Group PSLRA Litigation | §<br>§<br>§ | Master File No. 06-CV-1691(JMR/FLN) |

### EXPERT REPORT OF PROFESSOR CHARLES SILVER CONCERNING THE REASONABLENESS OF CLASS COUNSELS' REQUEST FOR AN AWARD OF ATTORNEYS' FEES

| | | |
|---|---|---|
| 1. | SUMMARY OF OPINIONS | 2 |
| 2. | CREDENTIALS | 2 |
| 2.1. | GENERAL | 2 |
| 2.2. | CLASS ACTIONS AND OTHER LAWSUITS INVOLVING MULTIPLE CLAIMANTS | 3 |
| 2.3. | ATTORNEYS' FEES | 4 |
| 2.4. | PROFESSIONAL RESPONSIBILITY | 6 |
| 3. | DOCUMENTS REVIEWED | 7 |
| 4. | SYNOPSIS | 8 |
| 5. | BACKGROUND | 10 |
| 6. | THE FEE AND EXPENSE AGREEMENT | 14 |
| 7. | THE REQUESTED FEE AWARD IS REASONABLE UNDER THE PSLRA | 16 |
| 7.1. | THE PSLRA'S MECHANISM FOR SETTING FEES | 16 |
| 7.2. | THE LIMITED ROLE OF JUDGES IN FEE REGULATION UNDER THE PSLRA | 19 |
| 7.3. | ONLY EXCEPTIONAL CIRCUMSTANCES WOULD WARRANT A DECISION TO RE-SET FEES EX POST | 24 |
| 7.4. | THE LEAD PLAINTIFF WAS SOPHISTICATED | 32 |
| 7.5. | THE LEAD PLAINTIFF HAD A STAKE IN SETTING FEES REASONABLY | 33 |
| 7.6. | THE LEAD PLAINTIFF HAD ACCESS TO A COMPETITIVE MARKET FOR LEGAL SERVICES | 34 |
| 8. | THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEE AWARDS IN OTHER CLASS ACTIONS | 36 |
| 8.1. | SECURITIES CLASS ACTIONS | 36 |
| 8.2. | CLASS ACTIONS IN GENERAL | 41 |
| 9. | THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEES PROMISED BY SOPHISTICATED CLIENTS | 48 |
| 10. | THE REQUESTED FEE IS REASONABLE UNDER PREVAILING ETHICAL STANDARDS GOVERNING THE CONDUCT OF ATTORNEYS | 52 |
| 10.1. | CALPERS MADE "A FREE AND INFORMED CHOICE" | 52 |
| 10.2. | THE AGREED FEE IS WITHIN THE RANGE CHARGED BY LAWYERS IN SIMILAR REPRESENTATIONS | 53 |
| 10.3. | NO RELEVANT CIRCUMSTANCES CHANGED | 53 |

I, Charles Silver, declare as follows:

1.   **SUMMARY OF OPINIONS**

- The requested fee award is reasonable because it was agreed to before settlement negotiations commenced by a sophisticated lead plaintiff armed with a large stake in the outcome, knowledge of the risks and rewards, separate legal and financial representation, and access to a competitive market for legal services;

- The requested fee award is reasonable when compared to fee awards in other class actions;

- The requested fee award is reasonable when compared to fees paid by sophisticated clients; and

- The requested fee award is reasonable under prevailing ethical standards governing the conduct of lawyers.

2.   **CREDENTIALS**

   **2.1.   General**

I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.   I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.   I received tenure in 1991, and held visiting professorships in the law schools at the University of Michigan and Vanderbilt University in 1994 and 2003, respectively.

2

I have published or am in the process of publishing over 60 major writings. A copy of my resume, which includes a list of my publications, is attached. I also have several works in progress, including two on the management of fees in multi-district lawsuits, and have recently produced a series of empirical studies of tort litigation in Texas using an enormous database of closed insurance claims maintained by the Texas Department of Insurance. Most of these studies have appeared in peer-reviewed journals. I have presented papers and comments at many conferences and law schools and have appeared as an expert witness many times.

### 2.2.    Class Actions and Other Lawsuits Involving Multiple Claimants

I have taught and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years. I have written about the law and economics of class actions and other large lawsuits for many years. My published and forthcoming works include:

- Charles Silver and Sam Dinkin, Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions, 57 DePaul Law Review 471 (2008);

- Paul Edelman, Richard Nagareda, and Charles Silver, The Allocation Problem in Multiple-Claimant Representations, 14 Supreme Court Economic Review 95 (2006);

- Charles Silver, Merging Roles: Mass Tort Lawyers as Agents and Trustees, 31 Pepperdine Law Review 301 (2004);

- Charles Silver, We're Scared To Death: Class Certification and Blackmail, 78 New York University Law Review 1357 (2003);

- Charles Silver, Law and Economics of Class Actions and Group Lawsuits, International Encyclopedia of Law and Economics (2000);

- Charles Silver, Comparing Class Actions and Consolidations, 10 Texas Review of Litigation 496 (1991); and

- Jules Coleman and Charles Silver, Justice In Settlements, 4 Social Philosophy and Policy 102 (1986).

3

My writings have been cited in leading treatises and other authorities, including the *Manual for Complex Litigation, Third* (1996) and the *Manual for Complex Litigation, Fourth* (2004).   I currently serve as an Associate Reporter on the American Law Institute's Project on the Principles of Aggregate Litigation.

I also have substantial practical experience with group lawsuits.  I have submitted amicus curiae briefs on class action issues to the Supreme Court of the United States and the Supreme Court of Texas.  (I was the principal author of an amicus brief submitted to the U.S. Supreme Court on behalf of a group of law professors in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), urging affirmance of the Third Circuit's standard for the certification of settlement classes.   The Supreme Court affirmed on the issues addressed in the brief.)   I have testified before and submitted written comments to the Advisory Committee on the Rules of Practice and Procedure of the Judicial Conference of the United States regarding proposed amendments to the federal class action rule.  I have also testified as an expert witness on class action issues, including certification, settlement, and attorneys' fees, in state and federal courts.  Finally, I have served as co-counsel or consulting counsel in several class actions and have advised lawyers on aspects of many group lawsuits involving large numbers of clients.

### 2.3.    Attorneys' Fees

I have written at length about the subject of attorneys' fees and fee awards, including lodestar-based fee awards, fee awards in class actions, and fees charged in group representations.  My published works include:

- Charles Silver & Sam Dinkin, Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions, DePaul Law Review (forthcoming 2008);

- Charles Silver, Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider, 20:3 The NAPPA Report 7 (August 2006);

- Charles Silver, Dissent from Recommendation to Set Fees Ex Post, 25 Review of Litigation 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, Report on Contingent Fees in Class Action Litigation, 25 Review of Litigation 459 (2006));

- Charles Silver, Does Civil Justice Cost Too Much? 80 Texas Law Review 2073 (2002)

- Charles Silver, A Critique of Burrow v. Arce, 26 William & Mary Environmental Law & Policy Review 323 (2001);

- Charles Silver, Due Process and the Lodestar Method: You Can't Get There From Here, 74 Tulane Law Review 1809 (2000);

- Charles Silver, Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers, 4 Connecticut Insurance Law Journal 205 (1998);

- Charles Silver, Incoherence and Irrationality in the Law of Attorneys' Fees, 12 Review of Litigation 301 (1993);

- Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Texas Law Review 865 (1992); and

- Charles Silver, A Restitutionary Theory of Attorneys' Fees in Class Actions, 76 Cornell Law Review 656 (1991).

My writings have been cited in treatises, law review articles, and published judicial opinions in several states. Section 30 of the American Law Institute's *Restatement (Third) of Restitution & Unjust Enrichment*, which sets out principles to govern fee awards in common fund cases, cites my 1991 *Cornell Law Review* article and generally follows its approach.

I have substantial practical experience with attorneys' fees issues. I have submitted expert affidavits and testified as an expert on attorneys' fees many times and in many locations, including federal and state courts, the U.S. House of Representatives, and the Texas legislature.

### 2.4.    Professional Responsibility

The subject of attorneys' fees falls within the area of professional responsibility, also called legal ethics or the law governing lawyers.  I have taught a survey course in professional responsibility for many years, and I now offer a class that focuses exclusively on litigation, under the title Professional Responsibility for Civil Litigators.

My writings on professional responsibility are extensive and include the following:

- Charles Silver, When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs, 44 Arizona Law Review 787 (2002);

- Ellen Smith Pryor and Charles Silver, Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases, 15 Georgetown Journal of Legal Ethics 30 (2001);

- Charles Silver and Frank B. Cross, Review Essay, What's Not To Like About Being A Lawyer?, Yale Law Journal (2000);

- Ellen Smith Pryor and Charles Silver, Defense Lawyers' Professional Responsibilities: Part I--Excess Exposure Cases, 78 Texas Law Review 599 (2000);

- Lynn A. Baker and Charles Silver, The Aggregate Settlement Rule and Ideals of Client Service, 41 South Texas Law Review 227 (1999);

- Charles Silver and Lynn Baker, I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds, 84 University of Virginia Law Review 1465 (1998);

- Charles Silver and Lynn Baker, Mass Lawsuits and the Aggregate Settlement Rule, 32 Wake Forest Law Review 733 (1997);

- Charles Silver, The Legal Establishment Meets the Republican Revolution, 37 South Texas Law Review 1247 (1996);

- Charles Silver, Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers, 65 Fordham Law Review 233 (1996);

- Charles Silver, Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas, 58 Law & Contemporary Problems 213 (Summer/Autumn 1996) (multiple authors);

- Charles Silver and Michael Sean Quinn, All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram, 6 Coverage 47 (May/June 1996);

- Charles Silver and Michael Sean Quinn, Are Liability Carriers Second-Class Clients? No, But They May Be Soon--A Call to Arms against the Restatement of the Law Governing Lawyers, 6 Coverage 21 (Jan./Feb. 1996);

- Charles Silver and Michael Sean Quinn, Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers, 5 Coverage 1 (Nov./Dec. 1995);

- Charles Silver & Kent Syverud, The Professional Responsibilities of Insurance Defense Lawyers, 45 Duke Law Journal 255 (1995); and

- Charles Silver, Does Insurance Defense Counsel Represent the Company or the Insured?, 72 Texas Law Review 1583 (1994).

In 1997, a program sponsored jointly by the Insurance Law and Professional Responsibility Sections of the Association of American Law Schools was devoted to my work on the professional responsibilities of insurance defense lawyers. My work in this area significantly influenced the *Restatement (Third) of the Law Governing Lawyers*, Formal Opinion 96-403 of the American Bar Association, and decisions issued by state courts. I am a former member of the Executive Committee of the Professional Responsibility Section of the Association of American Law Schools.

## 3.    DOCUMENTS REVIEWED

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case. I may also have reviewed other items, including without limitation cases and published scholarly works.

- Robert Patton, Branko Jovanovic, and Svetlana Starykh, Do Options Backdating Class Actions Settle For Less? -- October 2008 Update (National Economic Research Associates, Inc., Oct. 22, 2008), available at http://www.nera.com/publication.asp?p_ID=3618,

- The D&O Diary, Options Backdating Lawsuits: Settlements, Dismissals, Denials (last updated December 17, 2008), http://www.dandodiary.com/2007/10/articles/options-backdating/the-list-options-backdating-settlements-dismissals-and-denials/

7

- RiskMetrics Group, Securities Litigation Watch, Options Backdating - Newest Update, (Aug. 1, 2008), http://slw.riskmetrics.com/2008/08/options_backdating_newest_upda.html

- Adam T. Savett, Tracking the Options Backdating Securities Class Actions (RiskMetrics Group –Securities Class Action Services, August 2008), available at http://slw.riskmetrics.com/Options_Backdating.pdf

- Stephanie Plancich and Svetlana Starykh, 2008 Trends in Securities Class Actions, (NERA, December 2008), available at http://www.nera.com/image/PUB_Recent_Trends_Report_1208.pdf.

- Stephen Taub Class-Action Settlement Size Is Surging, CFO.com, January 3, 2007, available at http://www.cfo.com/article.cfm/8491868/c_8484720.

- Tom Murphy, Former UnitedHealth CEO Settles Options Lawsuit, AP (Sept. 10, 2008).

- Order, In re UnitedHealth Group Incorporated Shareholder Derivative Litigation, 2007 U.S. Dist. LEXIS 94616 (D. Minn. Dec. 26, 2007).

- Opinion, In re UnitedHealth Group PSLRA Litigation, 2007 U.S. Dist. LEXIS 40623 (D. Minn. June 4, 2007).

- Memorandum of Understanding (Lubben)

- Memorandum of Understanding (UnitedHealth)

- Memorandum of Understanding (McGuire)

- Expert Report of William H. Beaver

**4.**      **SYNOPSIS**

This settlement provides an opportunity for a Court to validate the successful operation of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.A. § 78u-4, which places sophisticated institutions with large claims in charge of securities fraud class actions. Here, the Court appointed the largest pension fund in the U.S., the California Public Employees' Retirement System ("CalPERS"), as Lead Plaintiff on October 21, 2006. CalPERS engaged Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), which the Court approved Lead Counsel. Thereafter, CalPERS and Coughlin Stoia prosecuted investors' claims diligently. They obtained the largest

monetary settlement ever in an options backdating case,[1] funded in part by contributions from former officers of UnitedHealth. They also secured the surrender of options worth millions of dollars and path-breaking corporate governance reforms.

The PSLRA sought to encourage sophisticated investors with superior resources to serve as lead plaintiffs in securities class actions. In this instance, it succeeded. By any measure of litigation ability, CalPERS was well suited to control this case. CalPERS has long been renowned for its advocacy on behalf of shareholders. CalPERS also demonstrated its ability as Lead Plaintiff by selecting excellent counsel to provide legal representation for the class. Coughlin Stoia is one of the country's premier securities litigation firms.

In July and August of 2007, CalPERS and Coughlin Stoia set out the terms that would govern their financial rights and responsibilities. By formalizing this relationship, CalPERS fulfilled the role the PSRLA assigns to lead plaintiffs, namely, the role of selecting and retaining counsel for the class. Insofar as I am aware, CalPERS also fulfilled its other responsibilities. It monitored Coughlin Stoia's efforts, actively participated in settlement negotiations, and approved the proposed settlement terms. These efforts helped produce this outstanding settlement.

The time has now come for the Court to oversee the division of the recovery between the Lead Plaintiff, the absent investors, and their attorneys. Lead Counsel's fee application asks the Court to respect and enforce the bargained-for terms set out in the retainer agreement near the start of the case. This is the correct result, for two reasons.

---

[1] I am informed that this is the largest securities class action recovery ever in this Circuit.

First, under the PSLRA, Lead Plaintiff selects class counsel and sets class counsel's fee. Given its experience in litigation and the size of its claim, CalPERS had the wisdom to select excellent lawyers and the incentive to bargain for a reasonable rate. CalPERS also performed well as Lead Plaintiff. Its judgment concerning the reasonable fee therefore merits deference.

Second, the fee and expense provisions in the agreement between CalPERS and Coughlin Stoia are reasonable in light of all relevant standards, including fees paid by sophisticated business clients in the market for legal services, fees awarded in other securities class actions and in class actions in general, and prevailing ethical standards governing the conduct of attorneys.

## 5.    BACKGROUND

When this lawsuit was filed on May 5, 2006, securities fraud class action litigation involving backdated stock options was uncharted territory. The table reproduced in Exhibit 1, taken from a publication by Securities Class Action Services, summarizes the universe of class action litigation from the first filing in 2005 through Aug. 1, 2008. As can be seen, few class actions were filed before this one, and none had been resolved or, in all likelihood, even made much progress. For example, the first dismissal occurred in late 2006. One could only guess how plaintiffs would fare on the merits or on the crucial procedural issue of class certification.

With the benefit of hindsight, we know that plaintiffs often fared poorly. Of the 39 options backdating class action lawsuits filed before August 1, 2008, 10 were

dismissed.[2]   The *ex post* odds of losing outright were therefore slightly above 25%. Plaintiffs fared better in 14 other lawsuits, which settled.   But the recoveries were modest.   Excluding this case, the average for all cases settled as of Aug. 1, 2008 was $36.41 million.   RiskMetrics Group, Securities Litigation Watch, Options Backdating - Newest Update, (Aug. 1, 2008), http://slw.riskmetrics.com/2008/08/options_backdating_newest_upda.html.

The small size of the backdating settlements attracted the attention of the National Economic Research Associates (NERA), a private consulting firm that has reported on securities class action litigation for years.   In October of 2008, NERA published a study showing that the backdating cases were settling for less than its model based on historical securities fraud settlements predicted.   Robert Patton, Branko Jovanovic, and Svetlana Starykh, Do Options Backdating Class Actions Settle For Less? -- October 2008 Update (National Economic Research Associates, Inc., Oct. 22, 2008).   In NERA's words, "the actual settlements … in backdating class actions have averaged about 74% of the settlements predicted by [its] model." Id., p. 2.   This finding, based on 15 settlements, *included* the settlement in this case.   When this settlement was excluded, recoveries ran about 43% of the amount NERA's model predicted.   *Id*., p. 2, n. 1.   The lack of success in these cases relative to historical standards for securities fraud class actions may explain why few new cases are being filed.   NERA reports that filings peaked in 2006.   Only 5 backdating class actions were commenced in 2008, with only 1 case being opened in the

---

[2] The D&O Diary reports that courts denied motions to dismiss in 7 options backdating class actions in 2007 and 2008.  The D&O Diary, Options Backdating Lawsuits: Settlements, Dismissals, Denials, Table 3 (December 17, 2008).

second half of the year. Stephanie Plancich and Svetlana Starykh, 2008 Trends in Securities Class Actions, Figure 2, p. 3 (NERA, December 2008).

By comparison, this settlement is an astonishing success. At $925.5 million, this case is the largest settlement in a backdating case by far. It more than doubles all other backdating settlements combined. Using NERA's model, the settlement is 506% of the amount the class was predicted to recover. Even by comparison to other securities fraud settlements, the recovery is exceptional. "[B]efore 2006 only three settlements had ever exceeded $1 billion." Stephen Taub, Class-Action Settlement Size Is Surging, CFO.com, January 3, 2007 (quoting experts from NERA). Subsequently, several multi-billion-dollar settlements occurred: $2.7 billion in AOL Time Warner; $1.1 billion in Royal Ahold NV; two separate $1.1 billion settlements resulting from two Nortel Networks class action cases; and the Enron settlement which, at approximately $7.2 billion, was the largest of all. Despite being a backdating class action, this settlement is one of the 10 largest securities fraud recoveries of all time.

The litigation and settlement also achieved other noteworthy ends:

- The litigation froze options controlled by William McGuire, the former UnitedHealth CEO, which at the time of the freeze were worth over $1 billion.

- McGuire will pay $30 million to the class from personal funds, and David J. Lubben, the former General Counsel of United Health, will pay $500,000. Neither McGuire nor Lubben will be reimbursed for these payments from any source. In securities fraud settlements, personal

contributions from officers are rare, and payments in this range are unheard of.

- McGuire will also return options representing more than 3 million shares of UnitedHealth.

The settlement also obtained a host of corporate governance reforms for UnitedHealth and its shareholders:

- A shareowner nominated director, a lead independent director, and limit on the number of other company boards upon which members of UnitedHealth's board may sit.

- Enhanced independence standards and improved executive compensation.

- Mandatory holding period requiring senior managers to hold a portion of shares acquired by exercising options for at least a year and to grant options in an agreed manner going forward.

My understanding is that no Fortune 100 company had previously agreed to the appointment of a shareholder nominated director as part of a securities fraud settlement. The corporate governance improvements listed here are in addition to a host of changes implemented while this lawsuit was in progress which, under the settlement, must remain in place for at least five years.

Taken as a whole, option backdating class actions have fared poorly. Yet, the UnitedHealth settlement is simply spectacular. In monetary terms, it is the largest backdating settlement by orders of magnitude. It also contains unique and extensive corporate governance reforms and unprecedented, unreimbursed cash contributions by

individual defendants. It is a remarkable resolution of a lawsuit of a type that was exceptionally risky when commenced.

## 6.    THE FEE AND EXPENSE AGREEMENT

As stated, options backdating litigation was uncharted territory when this lawsuit was filed. Somewhat more was known about it in mid-2007, when CalPERS and Coughlin Stoia formalized the financial terms on which the firm would represent the class. But the news was not good. By mid-2007, only two options backdating class actions had settled, and the settlements were small. The Newpark Resources case yielded $9.8 million, and the Meade Industries case settled for $2.9 million. Two other cases, one involving Zoran Corp. and a second involving Aspen Technology, had been dismissed. Adam T. Savett, Tracking the Options Backdating Securities Class Actions (RiskMetrics Group –Securities Class Action Services, August 2008). In a few cases, including this one, motions to dismiss had been denied. The D&O Diary, Options Backdating Lawsuits: Settlements, Dismissals, Denials, Table 3 (December 17, 2008).

With this background information, one might have expected CalPERS to offer Coughlin Stoia an above-average fee. The combination of uncertain terrain and small recoveries could reasonably have led to a high percentage fee. In fact, the fee terms, which topped out at 13% of the recovery and are described in the table below, were low by comparison to both historical fee awards in securities fraud cases and fees in cases brought under the PSLRA. Applying the negotiated terms to the actual recovery, $925,500,000 yields a fee equal to 11.92% of the gross monetary recovery.

| TABLE 1: AGREED FEE TERMS* & FEE CALCULATION | | | |
|---|---|---|---|
| Recovery Level | Fee Percentage | Actual Recovery | Negotiated Fee |
| $0-$250M | 11% | $250,000,000 | $27,500,000 |
| $250M-$750M | 12% | $500,000,000 | $60,000,000 |
| Over $750M | 13% | $175,500,000 | $22,815,000 |
| TOTAL | 11.92% | $925,500,000 | $110,315,000 |

*Letter from Peter H. Mixon, CalPERS' General Counsel, to Darren Robbins, of Coughlin Stoia, dated August 24, 2007.

The fee terms set out in Table 1 are noteworthy in several respects. First, the fee is calculated on the gross monetary recovery, not on the recovery net of expenses. Nor is reimbursement of expenses provided for separately--expenses are included in the amount to be awarded. This arrangement gave Coughlin Stoia an incentive to invest in the case when doing so would increase the expected recovery by a larger amount while freeing CalPERS and the Court from having to guard against overspending. Overspending would hurt only Coughlin Stoia by reducing its net fee recovery.

Second, the percentages increase at the margin, meaning that as more dollars are recovered for the class, the percentage paid in fees becomes larger at the higher recovery levels. This is an attractive incentive structure, as I explain further below.

Third, the fee agreement entitled Lead Counsel to additional compensation "based on the economic value to shareowners of any cancellation or modification of outstanding options held by the defendants in the litigation." Letter from Peter H. Mixon, CalPERS' General Counsel, to Darren Robbins, of Coughlin Stoia, dated August 24, 2007. This encouraged Lead Counsel to obtain this important in-kind benefit for the class. In fact, the settlement requires McGuire to surrender options representing 3.675 million shares in

15

UnitedHealth. Even so, my understanding is that CalPERS has required Coughlin Stoia to waive any right to compensation on the monetary value this benefit represents. This further supports the reasonableness of the fee.

Fourth, the fee agreement required CalPERS to review and approve the final fee amount before Coughlin Stoia submitted its request for fees to the Court. This means that the fee request enjoys the continued support of the Lead Plaintiff. Under the PSLRA, this is important, for reasons developed below.

Fifth, and finally, insofar as I am aware, the fee agreement was negotiated at arm's length at a time when the costs and risks of litigation were palpable and the eventual recovery was unknown. In other words, the agreement is not collusive or tainted in any other way. It can therefore be considered a true business deal which the parties (CalPERS and Coughlin Stoia) expected to be mutually advantageous. Because the eventual settlement, $925.5 million, falls just over the threshold for the third percentage tier, the outcome was within the parties' contemplation, and the requested fee falls within the range of reasonableness.

## 7. THE REQUESTED FEE AWARD IS REASONABLE UNDER THE PSLRA

### 7.1. The PSLRA's Mechanism for Setting Fees

Class actions should be managed to maximize class members' expected net recoveries, i.e., their expected gross recovery minus the associated expenses. See *In re Cendant Corp. Litig.*, 264 F.3d 201, 254-55 (3d Cir. 2001) (observing that "a rational, self-interested client seeks to maximize net recovery; he or she wants the representation to terminate when his or her gross recovery minus his or her counsel's fee is largest"); *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) ("The goal of appointment [of class counsel] should be to maximize the net recovery to the class and to

16

provide fair compensation to the lawyer, not to obtain the lowest attorney fee.  The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee.").[3]  Higher fees are warranted when they help class members recover larger net amounts.  *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 458 (S.D. Texas 2002) ("Higher fees can result from superior services.")  *In Re Enron Corporation Securities, Derivative & "ERISA" Litigation*, NO. H-01-3624, *Conclusions of Law, Findings of Fact, and Order Re Award of Attorneys' Fees from Settlement Fund* (S.D. TX--Houston, Sept. 8, 2008) (same).

The difficulty lies in figuring out how to set fees optimally.  Spending more on legal services can make class members better off by raising their net recoveries, but it can also harm them if it continues beyond the point of diminishing returns.  To address this problem, class members need an informed litigation manager with control of day-to-day decision making who appreciates the trade-offs that must be made and who gains by getting the trade-offs right.

The PSLRA appoints the lead plaintiff, paradigmatically a sophisticated investor with a large financial stake in the outcome of a lawsuit, to fill this position.  It does so in hope of taking advantage of a natural harmony of interests between the lead plaintiff and other investors, all of whom are in roughly the same position.  By managing a lawsuit well, a lead plaintiff maximizes its own expected net recovery.  Because the lead

---

[3] See also Lucian Arye Bebchuk, The *Questionable Case for Using Auctions to Select Co-Counsel*, 80 *Washington University Law Quarterly* 889, 890 (2002) ("From the perspective of the class, it would be desirable to select ... a fee schedule so as to maximize the expected net recovery for the class.  This expected net recovery is in turn equal to (i) the expected recovery in the case, minus (ii) the expected expenditure on legal representation."); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 *Tulane Law Review* 1809, 1841 (2000) ("[J]udges should set percentages with an eye to encouraging lawyers to maximize the value of class members' claims.  They should do what the sole holder of an entire set of claims would do, namely, select the fee formula that is expected to yield the largest net recovery after the lawyers are paid.").

plaintiff's recovery is a *pro rata* share of a common fund, however, to maximize its own net share, the lead plaintiff must maximize the net size of the entire fund, for the benefit of all concerned.[4]  This benefits other investors, who collectively own what remains after the lead plaintiff and litigation costs are paid.  Other investors "free-ride" on the lead plaintiff's careful management until the end of the case, at which time they file claims.

In keeping with the policy decision to rely on lead plaintiffs to manage class actions, the PSLRA employs a simple approach to fee regulation.  It empowers adequate lead plaintiffs, subject to trial courts' approval, to "select and retain" counsel for investor classes, 15 U.S.C.A. § 78u-4(a)(3)(B)(v), and it limits "[t]otal attorneys' fees and expenses" to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *Id.*, § 78u-4(a)(6).  The PSLRA does not tell lead plaintiffs which law firms to hire or how much to pay them.  It relies on lead plaintiffs, acting in their own self-interest, to get these matters right.

> Th[is] mechanism discourages overpayment because lead investor-plaintiffs spend their own money.  The higher the fee, the more of their recoveries they must hand over to attorneys.  They should therefore bargain hard, acquire any information or assistance they need to fix reasonable fees, and agree to higher fees only when paying more increases their expected net recoveries

Charles Silver, *Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider*, 20:3 *The NAPPA Report* 7, 7 (August 2006).

---

[4] The PSLRA limits the lead plaintiff to a "share of any final judgment or of any settlement that is … equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class."  15 U.S.C.A. § 78u-4(a)(4).  The lead plaintiff may also obtain reimbursement for costs and expenses "directly relating to the representation of the class." *Id.*

### 7.2.    The Limited Role of Judges in Fee Regulation under the PSLRA

It is almost correct to say that, when Congress enacted the PSLRA, it reduced lead counsel's identity and compensation terms to matters judges ought to treat with deference. The "right" lawyer for a case depends on the facts, as does the "right" fee. A sophisticated lead plaintiff with a large financial stake and experience in securities litigation should have good information about both matters and should also make good decisions.   A lead plaintiff can actually shop for counsel.   It can evaluate lawyers' credentials, assess the "fit" between lawyer and client, compare requested compensation terms, and use market pressure, including the prospect of future business, to extract concessions.  It can also make tradeoffs with an eye to its own bottom line.  Sometimes, a lead plaintiff will be better off hiring a superior lawyer at a higher price; sometimes, a lesser attorney who charges a lower fee will be fine.  Voluntary transactions in the market for legal services are likely to match clients to lawyers better than assignments by regulators.

Professors Elliot Weiss and John Beckerman, who conceived and provided the analytical foundation for the PSLRA's fee-setting mechanism, expressly anticipated that lead plaintiffs' would handle fees differently than judges.  Although they could not "predict exactly what [] arrangements" lead plaintiffs would use, they speculated that lead plaintiffs' preferred arrangements might "differ substantially from the fee structures that courts currently employ."  Elliott J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 *Yale Law Journal* 2053, 2107 (1995).   See also *Id.*, at 2121 (contending that "[i]nstitutions with the largest stakes in class actions are better situated than plaintiffs' attorneys or courts to protect class members' interests.").

19

Displaying remarkable prescience, Weiss and Beckerman guessed that institutional investors might jettison the judicial practice of tying lower percentages to higher recoveries. "To encourage its attorneys to pursue strong cases more vigorously, an institution might agree to pay them *an increasing portion* of any recovery in excess of some stipulated threshold (e.g., forty percent of the damages initially sought)." *Id.* (emphasis added). As mentioned above, the parties used a scale of increasing percentages in this case.

A lead plaintiff's decision to offer a given percentage (or given range of percentages) should reflect all important case characteristics and market conditions, including economies of scale, opportunities to hire cheaper lawyers in other jurisdictions, etc. By ignoring any important consideration, a lead plaintiff would harm itself. It would offer too high a fee, reducing its expected net recovery needlessly.

Reflecting the force of this argument, many courts have "accord[ed] a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel," thereby ensuring "that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers." *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001). See also *In re Cardinal Health, Inc. Sec.* Litig., 528 F.Supp. 2d 752, 758-59 (S.D. Ohio 2007); *In re EVCI Career Colleges Holding Corp. Securities Litigation*, 2007 WL 2230177 (S.D.N.Y. 2007); *In re AT & T Corp.*, 455 F.3d 160, 168 (3d Cir. 2006); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298, 301 n.10 (3d Cir. 2005); *Schwartz v. TXU Corp.*, 2005 WL 3148350 (N.D. Tex. 2005); *In re Global Crossing Sec. & ERISA Litig.* 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("[I]n class action

cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *In re Lucent Technologies, Inc. Sec. Litig.*, 327 F.Supp.2d 426, 432 (D.N.J. 2004) ("Under [the] PSLRA, a fee[] award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness.  This presumption preserves the lead plaintiff's role as 'the class's primary agent vis-a-vis its lawyers.'  Absent unusual and unforeseeable changes, courts should honor that presumption.") (citations omitted).  This presumption "reflects the reality that prices are best set by buyers and sellers bargaining in competitive environments."  Silver, *Reasonable Attorneys' Fees in Securities Class Actions*, *supra*, at 7.

Even courts that decline to entertain a presumption "would certainly give the Lead Plaintiff's determination considerable weight," especially when the Lead Plaintiff "effectively []fulfilled the statutory intent of the PSLRA in controlling and monitoring the [] litigation." *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, 2008 U.S. Dist. Lexis 84708 (S.D. TX 2008).  In *WorldCom*, which also settled for billions of dollars, the trial judge based the fee award on the retainer agreement.  While recognizing that the agreement was not binding, the court deferred to it: "[W]hen class counsel in a securities lawsuit have negotiated an arm's length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close superrivison of the litigation, the court should give the terms of that agreement great weight." *In re WorldCom Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005).  This analysis is entirely correct.  Judge

Melinda Harmon also gave great deference to the fee agreement in the *Enron* case, which produced the largest recovery in the history of class action litigation, $7.2 billion. She awarded exactly the amount the agreement contemplated. *In Re Enron Corporation Securities, Derivative & "ERISA" Litigation*, 2008 U.S. Dist. Lexis 84708. See also *In re Dynegy, Inc. Securities Litigation*, Master File No. H-02-1571, *Order Awarding Attorneys' Fees and Reimbursement of Expenses*, (S.D. Tex. July 8, 2005) (awarding fee provided for in fee agreement).

Still, the PSLRA does require judges to approve lead plaintiffs' choice of counsel. It also limits attorneys' fees and expenses to a reasonable percentage of the recovery. These provisions require one to ask when judges should overrule or modify lead plaintiffs' decisions.

The first and foremost answer is that judges should make their dissatisfaction known at the start of litigation. Potential lead plaintiffs' choice of counsel is always clear from their pleadings, and their agreed compensation can be disclosed as well. A judge can, and should, deny the role of lead plaintiff to a candidate who hires inappropriate counsel or offers excessive compensation.[5] "[O]ne of the best ways for a court to ensure that [a lead plaintiff candidate] will fairly and adequately represent the interests of [a] class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel." *In re Cendant Corp. Litigation*, 264 F.3d 201, 265 (3rd Cir. 2001).

The reasons for deciding these matters early are obvious. First, by allowing class litigation to proceed with bad lawyers at the helm or bad compensation terms in place,

---

[5] I take no position on whether a judge should afford an opportunity to modify the choice of counsel or the terms of compensation before rejecting a candidate's application.

22

judges would saddle investors with inadequate representation, in violation of the PSLRA

and Federal Rules of Civil Procedure 23.  Second, and relatedly, by setting fees upfront,

judges avoid settlement conflicts between lawyers and class members that arise when

lawyers bargain for relief and fees separately.  Third, by leaving lead plaintiffs' choices

of counsel and fee agreements in place, judges encourage lead plaintiffs, lawyers, and

class members to rely on those terms.  Fourth, by reviewing these matters on the back end

of lawsuits, judges allow hindsight bias to distort with their decisions.

I have long argued that judges presiding over class actions and other fee award

cases should set lawyers' compensation terms at or near the start of litigation.[6]  Other law

professors have also endorsed this view.  Two of them, Professors Weiss and Beckerman,

developed a mechanism for securities cases that would "place institutional investors in a

position to negotiate fee arrangements with plaintiffs' lawyers *before class actions are

initiated.*"  Weiss and Beckerman, *Let the Money Do the Monitoring, supra*, 104 *Yale

Law Journal* at 2107 (emphasis added).  See also *Id.*, at 2108 (criticizing an alternative

fee proposal that would not have "relieve[d] courts of the task of deciding, on an *ex post*

basis, how to compensate plaintiffs' attorneys for their efforts").  Congress built their fee-

setting mechanism into the PSLRA.

*Ex ante* fee bargaining is desirable for many reasons, one of which is that it

enables an institutional investor to demonstrate that it will adequately represent a class.

---

[6]See Charles Silver, *Dissent from Recommendation to Set Fees Ex Post*, 25 *Review of Litigation* 497, 497 (2006) ("The tradition of setting fees [in class actions] *ex post* is responsible for much that is wrong with the modern class action"); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 *Tulane Law Review* 1809, 1834 (2000) ("[J]udges should announce the percentages they will award shortly after [class] litigation commences"); Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 *Cornell Law Review* 656, 704, n. 232 (1991) (observing that '[t]here is much to be said in favor of the *ex ante* approach" to fee-setting in class actions).  I have also designed procedures judges might use when setting fees.  Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 *Texas Law Review* 865 (1992).

Adequacy is required by Federal Rule of Civil Procedure 23(a) and by the PSLRA, which directs a trial court presiding over a securities class action to "appoint as lead plaintiff the member or members … most capable of adequately representing the interests of" all investors.  15 USC § 78u-4(a)(3)(B)(i).  The PSLRA denominates this class member the "most adequate plaintiff."  *Id.*  In this case, CalPERS structured its relationship with Lead Counsel appropriately by bargaining over fees in 2007.

### 7.3.    Only Exceptional Circumstances would Warrant a Decision to Re-Set Fees *Ex Post*

When a lead plaintiff agrees to a fee arrangement that was reasonable when set, the arrangement should ordinarily survive scrutiny on the back end.  Only exceptional circumstances justify a reversal.  An enormous settlement is not one of them.

One reason for limiting judicial fee re-setting on the back end to exceptional cases is that frequent re-setting would make lead plaintiffs' promises unreliable or irrelevant. This would weaken lawyers' incentives to invest in litigation and harm investors by reducing their expected net recoveries.  Ordinary business conduct in a variety of contexts reflects this concern.  Owners of oil-bearing lands and operators of oil wells typically assign rights to proceeds before wells are drilled, when there are no proceeds to share. Venture capitalists obtain shares in start-up companies early on.  They do not wait for those companies to become profitable to bargain over their returns.  Joint venturers in risky projects assign rights early because secure expectations foster good investment decisions.

Plaintiffs in litigation and their lawyers act the same way.  "When a plaintiff hires a lawyer directly and promises to pay a contingent fee, neither principal nor agent knows whether there will be a recovery or how large it will be, but both know how the proceeds

24

of any settlement or judgment will be split." Silver, *Due Process and the Lodestar Method*, *supra*, at 1834. This behavior encourages lawyers to invest. It also helps overcome lawyers' aversion to risk. Like most people, lawyers demand premiums for taking risks, and the premiums increase as the risks rise. Many contingent fee lawyers might willingly attempt to double their money by putting $1,000 worth of resources into a case with a 50% chance of generating $4,000 in fees. Few would risk $1 million for a 50% chance of earning $4 million, even though doubling one's money is still the expected result. Losing $1,000 is unpleasant, but it does not mean bankruptcy or the collapse of a law firm. Losing $1 million could mean both of the above and worse. Even a 50% chance of earning $10 million in fees would fail to encourage many attorneys to gamble $1 million in resources on the outcome of a single case.

Because risk aversion grows as stakes rise, stable expectations of compensation are most important in the largest class actions with the highest stakes. Lead Counsel lent the plaintiff class lawyer time worth tens of millions and bore millions more in expenses. Only a firm with a phenomenal resource base could afford to invest so heavily in risk-laden litigation, but that is only part of the point. Even a firm with terrific resources has no incentive to squander them. Lead Counsel found it rational to underwrite this lawsuit only because it expected enormous success in litigation to generate an enormous return for the firm.

A second reason to limit the occasions on which judges re-set fees on the back end is that overcoming the presumption in favor of fee agreements negotiated by lead plaintiffs requires an identifiable and serious defect accompanied by a real opportunity for judicial improvement. As always in policy analysis, the issue is one of comparative

25

advantage.  Can judges do better than lead plaintiffs when it comes to setting fees?  Although lead plaintiffs may miss the bulls' eye by some distance, there is no reason in general to expect judges to be better marksmen.  Judges have neither better information, better access to markets, nor better incentives.

Given this, one threshold for judicial fee re-setting is obvious: The fee promised by the lead plaintiff must clearly exceed lead counsel's market rate.  Only then does a judge have a real opportunity to improve matters, because only then is it clear that enforcing a lead plaintiff's agreement would cause a class to overpay.  When a lead plaintiff promises a fee in the vicinity of a lead counsel's market rate, a judge should uphold it despite any other concerns, such as a lead plaintiff's failure to conduct an auction or to interview a larger number of law firms.  A judge cannot do better than set a fee at a lawyer's market rate.

Having read empirical studies of the market for legal services and having gathered anecdotal information about the fees clients pay in many contexts, I am convinced that CalPERS agreed to pay Lead Counsel a market rate.

A second threshold for judicial intervention is an identified failure in the bargaining environment that existed when lead counsel's compensation terms were hashed out.  The PSLRA anticipates that (1) sophisticated institutional investors with large financial stakes (2) interested in bargaining for market rates will (3) shop in a deep market for (4) lawyers offering attractive combinations of quality and price.  One or more of these conditions may not obtain in a given case, providing a possible basis for a judge to re-set a fee.

Why should an identified defect be a predicate for judicial intervention?  Three reasons.  First, a fee that exceeds a law firm's usual and customary rate can be warranted in an especially difficult case.  The percentages charged by contingent fee lawyers vary significantly across practice areas.   Medical malpractice lawyers may charge 50%.  Aviation lawyers often charge 15%.  The difference in fees reflects differences in the costs, risks, and rewards associated with the two areas of litigation.  The same may be true in class actions.  A law firm that handles one securities fraud case for a 20% fee may demand 30% in another.  The first case may be cheaper because the SEC investigated before the class action got underway, because the Department of Justice obtained an indictment, because the company restated it earnings, or because the damages were unusually large.  In competitive markets, fees vary.  Variation must be expected in class actions as well.

Second, in cases brought under the PSLRA, a learning process must occur with respect to fee setting, and this process will be delayed if judges often supplant lead plaintiffs' decisions with their own.  Congress wants lead plaintiffs to regulate lead counsels' fees, and it expects them to set fees appropriately.  Unless lead plaintiffs actually pay what they promise, however, the incentive to get fees right will disappear.  A lead plaintiff who knows that a judge will reduce the fee when litigation concludes can safely promise class counsel the moon and the stars.  A lead plaintiff who has to pay the agreed fee will spend money less freely.

Although I have not developed a complete history of CalPERS' experience in securities fraud litigation, I have determined, first, that CalPERS employed the Coughlin

Stoia law firm in at least one prior securities class action,[7] and, second, that CalPERS has

experience as an opt-out claimant and has apparently used the firm when filing securities

fraud lawsuits on its own behalf.[8]  I therefore infer that CalPERS was familiar with both

the quality of the law firm's work and its usual and customary fees before it hired the law

firm as Lead Counsel in this case.  I further infer that CalPERS was far along the learning

curve described above and could set a reasonable fee without outside assistance.

The hindsight bias, a well known defect in human reasoning, provides the third

reason for limiting *ex post* fee re-setting by judges to cases with identifiable defects.  The

hindsight bias occurs when a person who knows how a risk actually played out is asked

to "go back in time" and estimate the *ex ante* likelihood that the observed outcome would

occur.  For example, suppose one had asked college football fans to estimate the odds

that Florida would defeat Oklahoma *before* the 2009 Orange Bowl game was played.[9]

They might have said 50%.  Today, the same fans might put the *ex ante* odds at 70%

simply because they know Florida won.  "Learning how the story ends makes the

outcome seem inevitable and predictable, thereby distorting our perception of what could

have been predicted."  Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging

in Hindsight*, 65 *University of Chicago Law Review* 571, 571 (1998).

The hindsight bias also affects judges.  To prove this, three law professors gave

more than 100 federal magistrate judges a statement describing a case in which a prisoner

---

[7] Pirelli Armstrong Tire Corp. Retiree Medical Benefits, 229 F.R.D. 395 (S.D.N.Y. 2004).

[8] See John C. Coffee, Jr., Accountability and Competition in Securities Class Actions: Why 'Exit' Works Better than 'Voice' (July 2, 2008).  Columbia Law and Economics Working Paper No. 329.  Available at SSRN: http://ssrn.com/abstract=1113845.  A revised version of Coffee's article appeared in the Cardozo Law Review in 2008.  See also Kevin LaCroix, Opt-Outs: A Worrisome Trend in Securities Class Action Litigation, Oakbridge InSights (Vol. II, Issue 3) (April 2007).

[9] Being both a Gator and a Longhorn, I put the pre-game odds of a Florida victory at 100%.  Lest the Court forget, Texas beat Oklahoma on a neutral field.

appealed after being sanctioned by a trial judge for filing a frivolous complaint.   One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the final third indicated that the appellate court vacated the sanction entirely.   All the judges were then asked to "go back in time" and identify the result that was most likely to occur.   To no one's surprise, the judges' estimates of the "most likely" outcome depended on what they were told about the actual outcome.   "[T]he judges exhibited a predictable hindsight bias; when they learned that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred."   Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 *Cornell Law Review* 777, 803 (2001).

The hindsight bias poses a serious threat to the incentive structure of the class action.   To encourage lawyers to handle these cases, judges must set fees high enough to offset real risks.   In other words, they must set fees at levels that would have been appropriate "at the outset of [litigation] (that is, when the risk of loss still existed)." *Synthroid I*, 264 F.3d at 718.   When setting fees in connection with settlements, however, judges know recoveries were obtained.   This information will predictably cause them to over-estimate the *ex ante* odds of success, as in the experiment run by Guthrie *et al.* knowledge of the actual appellate decision inflated judges' estimates of the likelihood of that result.   In turn, these over-estimates will cause judges to set fees too low.

Because the hindsight bias is well known, the law has developed many practical responses to it.   Rachlinski, *supra,* 65 *University of Chicago Law Review,* Part IV.   The PSLRA's fee-setting mechanism is one more of these.   By empowering lead plaintiffs to

retain counsel on agreed terms at or near the start of litigation, the PSLRA enables them to set fees at levels that reflect real *ex ante* litigation risks. By affording lead plaintiffs' agreements a presumption of reasonableness, judges reduce the likelihood that facts knowable only *ex post*, such as the fact of a settlement or its size, will skew fees downward. Because a decision to set aside a lead plaintiff's fee agreement always gives the hindsight bias room to operate, a good reason for this decision should be required.

In this case, negotiations over fees occurred over a period of two months in 2007 and involved a lead plaintiff, CalPERS, known for its aggressiveness in advocating for shareholders. The lawyer representing CalPERS in the negotiations was Peter H. Mixon, its General Counsel. Mixon, who joined CalPERS in 1996 and served as Deputy General Counsel before becoming General Counsel in 2002, supervises an office "of 13 attorneys and support staff. He provides legal advice to the CalPERS Board, Committees, executive and senior management staff, and various CalPERS divisions on tax qualification, statutory interpretation, and other pension-related issues. He also represents CalPERS in litigation. Mr. Mixon has also held a supervisory role in the CalPERS Legal Office managing four attorneys. Prior to coming to CalPERS, Mr. Mixon was in private practice for approximately 10 years, where he represented a wide variety of public and private sector clients in predominately business litigation matters." Peter                                    H.                                    Mixon, http://www.calpers.ca.gov/index.jsp?bc=/about/organization/executives/peter-mixon.xml.

Mixon had ready access to the information needed to bargain effectively. For example, as a member of the National Association of Public Pension Attorneys (NAPPA), he could easily have gained information about prevailing rates from lawyers

for other institutions.  NAPPA is an organization of lawyers who represent public pension funds throughout the United States.  I know from personal experience that its members are keenly interested in the fees paid to class counsel in securities cases.  They exchange information about fees, and they use NAPPA's publication, *The NAPPA Report*, to argue for fee minimization.[10]

Information about securities litigation firms, fees, and related matters was also available from other sources.  For example, the Federal Judicial Center's (FJC) study of class actions in four federal district courts, whose findings on fees are described below, was available from the FJC's website,[11] and a pre-final version had appeared in the *New York University Law Review*.[12]  National Economic Research Associates (NERA) had begun its series of *Recent Trends* reports.[13]  Critics of class action fee awards were also around and offered their own statistics.[14]  They and, in particular, their widely publicized views about the excessiveness of class action lawyers' fees, were responsible for the success of the PSLRA, which a Republican Congress enacted over President Clinton's veto.  One could also learn about fees by reading settlement notices posted on the

---

[10] I have personal knowledge of the interest NAPPA members have in fees, having debated Wayne Schneider in the pages of *The Nappa Report*.  *See* Wayne Schneider, *Courts Don't Have To Award Excessive Fees To Incentivize Class Counsel In Federal Securities Class Actions: A Reply to Professor Silver*, 20 The NAPPA Report 8-10 (May 2006); and Charles Silver, *Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider*, 20:3 *The NAPPA Report* 7 (August 2006).

[11] Thomas E. Willging, *et al.*, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996) ("*FJC Study*").

[12] Thomas E. Willging, Laural L. Hooper, Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 New York University Law Review 74 (1996).

[13] See, e.g., Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (NERA, June, 1995); Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (NERA 1996).

[14] Vincent E. O'Brien, *A Study of Class Action Securities Fraud Cases, 1988-1996.*

Internet, fee opinions published on Westlaw and Lexis, and studies by law professors and other academics.

### 7.4.    The Lead Plaintiff was Sophisticated

CalPERS is a highly sophisticated institutional investor. CalPERS is the largest public employee retirement system in the United States, with assets of over $170 billion and nearly 1.4 million beneficiaries, including active and retired public employees. By virtue of the size of its investment portfolio, CalPERS is a fixture in the world of corporate governance. Historically, CalPERS has also been known as an activist investor, frequently pressing the companies whose securities it holds to implement pro-shareholder reforms.

CalPERS is administered by a 13-member Board of Administration.[15] One member of the Board is Bill Lockyer. Mr. Lockyer became an ex-officio member of the CalPERS Board of Administration in January 2007 upon his election as California State Treasurer. From 1999-2006, Mr. Lockyer served as California Attorney General. Before that, he served in the California legislature for 25 years. California's Comptroller, John Chiang, is also a member. He graduated with honors from the University of South Florida with a degree in Finance, and received his law degree from Georgetown University Law Center. Another Board member, the current Vice President, is George Diehr, a professor of management science in the College of Business Administration at California State University, San Marcos and a past President of the Academic Senate. Mr. Dierh possesses highly developed negotiating skills, having served as a member of the CFA contract bargaining team since 1999, and Chair of the Contract Development

---

[15] The information in this paragraph was taken from pages on CalPERS' website.

and Bargaining Strategy Committee since 2000. Other Board members add to this impressive set of talents and skills.

### 7.5.    The Lead Plaintiff had a Stake in Setting Fees Reasonably

CalPERS' trading data indicates that it lost more than $23 million on UnitedHealth securities. The size of CalPERS' loss and the possibility of recovering millions should have motivated CalPERS seek the best possible result in the lawsuit. By hiring excellent lawyers, CalPERS improved its own odds of recovering, and thereby the odds for the entire class. By establishing a payment scale that motivated its lawyers to develop innovative legal theories and to obtain recoveries from all possible sources, CalPERS again helped itself and the rest of the class. CalPERS and other investors also gained by keeping fees to the lowest level sufficient to obtain the caliber of representation required by the case. All this was clear when the Court granted CalPERS' motion to be appointed lead plaintiff.

Although the PSLRA focuses on an institution's financial loss, CalPERS also had (and has) its reputation as a fiduciary at stake. Had CalPERS not entered into a reasonable fee contract, it would have jeopardized its position and reputation. It would have signaled the Court, which could easily gain information about fee agreements negotiated by other public pension funds, that it could not negotiate a reasonable fee contract. An opinion denying CalPERS' application for this reason would have reflected badly on CalPERS, which is charged with managing beneficiaries' money prudently.

The contract obviously anticipates a recovery in the billion-dollar range. The final tier of the fee schedule starts at $750 million. The settlement is somewhat larger than that, but this does not make the fee unreasonable. It just shows that the recovery is outstanding, presumably to the delight of all investors. Outstanding work merits a

superior fee.  This is how contingent percentage fee arrangements are supposed to work: lawyers who do better for their clients also do better for themselves.

The members of CalPERS' Board of Administration undoubtedly knew that, in the event of a large recovery, their decision to offer Lead Counsel a percentage would face intense public scrutiny.  They also knew the enormous downside associated with over-paying the firm.  Given this, their willingness to support the fee agreement speaks loudly about the reasonableness of its terms.

### 7.6. The Lead Plaintiff had Access to a Competitive Market for Legal Services

The market for legal services is deep.  As Judge Frank Easterbrook observed when reviewing the fee award in *In re Synthroid Marketing Litigation*, 325 F.3d 974, 979 (7th Cir. 2003), "[n]o law firm supplies more than a tiny fraction of the nation's legal services (even of the specialized submarket in big-stakes litigation).  The Herfindahl-Hirschmann Index in this market is minuscule, and no evidence in this record implies that law firms have conspired to reduce competition."[16]

What is true of the legal services market in general is true for large securities lawsuits as well, as Judge Easterbrook implied.  Plaintiffs' firms compete fiercely for opportunities to represent large investment funds.  "It is no secret that big money for class action securities litigation firms lies in wooing state pension and retirement funds as clients...  [M]aking the cut is a top priority for securities lawyers.  'People recognize they've got to get themselves out there and sell their wares,' said Stuart Grant" of Grant & Eisenhofer, which "won about $610 million for its clients in securities class action

---

[16] "[T]he Hirschmann-Herfindahl Index" is "a metric commonly used by the US Department of Justice to assess the potentially anti-competitive effects of concentration within an industry."  James D. Cox, The Oligopolistic Gatekeeper: The U.S. Accounting Profession, Duke Law School Research Paper No. 117, p. 272 (August 2006).

settlements [in 2003]."  Leigh Jones, *Securities Litigators Vie for Lists*, *New York Law Journal* 1 (September 20, 2004).

Lawyers employed by public entities that manage pension funds, such as CalPERS, know that this brisk competition for their business enables them to cut rates. Consider the statements below, which Wayne Schnieder, General Counsel for the New York State Teachers' Retirement System, made in *The NAPPA Report*.

- "[S]ecurities class action lawyers are literally falling all over themselves, trying to get appointed class counsel by potential lead plaintiffs…. In this highly competitive environment, potential lead plaintiffs should have every reason to expect they can engage competent counsel at favorable rates."  Wayne Schneider, *Objections to Attorneys Fee Requests in Securities Class Actions*, 19 *The NAPPA Report* 9, 10 (February 2005).

- "If one firm doesn't want to do the case on an investor-friendly fee basis, the lead plaintiff can always look for another qualified firm willing to take the assignment for a favorable fee."  *Id.*

Other sources add interesting details.  The ranking of law firms Securities Class Action Services (SCAS)[17] published for 2003 shows that eighteen law firms, one of which was Lead Counsel, settled five or more cases that year.  SCAS, *The SCAS 50 for 2003*, http://issproxy.com/pdf/THESCAS502003.pdf.  The market thus contains many firms for which securities litigation is a significant source of income.  Another source reported that the New York state comptroller's office had long-term contracts with about

---

[17] SCAS is "a wholly-owned subsidiary of Institutional Shareholder Services[, which] maintains the leading database on securities class action litigation."  SCAS, *The SCAS 50 for 2003*, http://issproxy.com/pdf/THESCAS502003.pdf.

15 plaintiffs' firms in 2004.  Leigh Jones, *Securities Litigators Vie for Lists*, *New York Law Journal* 1 (September 20, 2004).

The existence of SCAS's top-50 list establishes that the market for lawyers offering securities litigation services has at least fifty firms.  Because the legal services sector as a whole contains thousands of firm, one might conclude that the biggest securities firms, like Lead Counsel, have sufficient market power to influence rates. Before inferring this, one must remember that no formal barriers to entry exist inside the market.  Law firms can develop as many practice areas as they wish.  If fees in the securities area were excessive over any sustained period, outsiders would move in and bid prices down.  Knowing this, firms already in the area should find it difficult to overcharge.

CalPERS' decision to hire Coughlin Stoia is easy to defend.  Coughlin Stoia is one of the most prestigious firms representing plaintiffs in securities class actions.  Given the firm's recent victory in the Enron litigation, which produced the largest settlement in the history of class action litigation, nothing more on this subject need be said.

## 8.    THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEE AWARDS IN OTHER CLASS ACTIONS

### 8.1.    Securities Class Actions

In *In re Synthroid Marketing Litigation*, 264 F.3d 712, 720 (7th Cir. 2001), Judge Easterbrook urged trial judges to consider "data from securities suits where large investors have chosen to hire counsel up front" when evaluating the reasonableness of fee requests.  Such data as are available, all of which are anecdotal, cast the fee promised by CalPERS in a favorable light.

36

For example, in an expert report, Professor John C. Coffee, Jr., a leading commentator on securities class actions, reported

> several examples of 'increasing percentage' fee contracts entered into between a very large plaintiffs' law firm and several large, sophisticated lead plaintiffs. In one case, the lead plaintiff in a securities class action agreed to an 'increasing percentage' formula that provided for payment to counsel of 25% of the balance of the recovery over $100 million. In another case in which a pension fund served as lead plaintiff in a securities class action, the fee formula increased so as to provide for payment of 25% of the balance over $50 million to class counsel.

*Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 13-14 (Oct. 7, 2004).

My experience is similar. Although I have participated in or read about securities cases in which sophisticated lead plaintiffs offered fees at or near 25%, I have also seen fee scales with lower values for certain recovery ranges. Table 5 shows sliding scales agreed to in other cases handled by Lead Counsel or one the predecessor law firms from which it evolved. The percentages run from 8% to 27%, and all of the scales tie the higher percentages to higher levels of recovery. The percentages promised by CalPERS fall near the bottom end of this range. Given the riskiness of backdating litigation, the percentages seem more than reasonable.

| TABLE 5: SCALES OF PERCENTAGES USED IN OTHER SECURITIES CASES HANDLED BY LEAD COUNSEL | | |
| --- | --- | --- |
| Case | Recovery Increment | Marginal Fee Percentage |
| In re Dollar General Corporation Securities Litigation | $0-$15 Million | 15% |
| | $15-$30 Million | 17.50% |
| | $30-$60 Million | 20% |
| | Greater than $60 Million | 22.50% |
| Schwartz v. TXU Corp. | $0-$20 Million | 18% |
| | $20-$40 Million | 20% |
| | $40-$75 Million | 22% |
| | Greater than $75 Million | 24% |
| Pirelli v. Hanover Compressor Company, et al | $0-$10 Million | 14% |
| | $10-$25 Million | 18% |
| | Greater than $25 Million | 24% |
| In re NorthWestern Corporation Securities Litigation | $0-$6 Million | 17% |
| | $6-$12 Million | 19% |
| | $12-$18 Million | 23% |
| | Greater than $18 Million | 27% |
| In re Cardinal Health, Inc. Securities Litigation | $0-$50 Million | 19% |
| | $50-$150 Million | 23% |
| | Greater than $150 Million | 25% |
| In re Dynegy, Inc. Securities Litigation | $0-$200 Million | 8% |
| | $200-$400 Million | 9% |
| | > $400 Million | 10% |
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | $0-$1 Billion | 8% |
| | $1-$2 Billion | 9% |
| | > $2 Billion | 10% |

The use of scales that increase with the amount recovered is good for class members. Rising scales tie the highest marginal rewards to the highest dollar levels of

recovery.  Because the highest dollar levels are the hardest to achieve, this is a sensible arrangement.  As Judge Easterbrook observed in *Synthroid I*, 264 F.3d at 718, "[p]rivate parties would never contract for [] an arrangement" capping fees at a very low level because this would encourage cheap settlements.  See also *Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 17 (Oct. 7, 2004) (reporting Professor Coffee's longstanding belief that courts should refrain from using "declining percentage" formulas because "defendants would quickly come to understand that plaintiffs' counsel lacked an incentive to maximize the recovery … and … could exploit this lack of incentive").

The table below, Table 6, displays more anecdotal information about fees agreed to by institutional investors.  The cases in it were culled from fee objections filed in other cases by the State of Wisconsin Investment Board (SWIB) and the New York State Teachers Retirement System (NYSTRS).  They are cases these objectors identified as having reasonable fees.  In all but one of them, the percentages promised exceed those CalPERS agreed to pay Lead Counsel.  The 7.5% fee set in *Bristol-Myers Squibb* is below the fee promised here, but it started out at 15% and was adjusted downward after class counsel lost the case, reflecting the fact that the SEC's efforts, not class counsel's, produced the settlement

| TABLE 6: FEES PROMISED IN OTHER SECURITIES CLASS ACTIONS | |
|---|---|
| **Case** | **Agreed Fee Percentage** |
| Anicom | 23.50% |
| Physicians Computer Network | 15% |
| CellStar | 18% |
| In re Interpublic Securities Litig. | 20% |
| In re Bristol-Myers Squibb Securities Litig. | Initially 15%; reduced to 7.5% after complaint was dismissed with prejudice; |
| Symbol Technolgies Inc. Securities Litig. | 17% requested; settlement notice does not indicate whether fee set by agreement with lead plaintiff |
| Gemstar-TV Guide International, Inc. Securities Litig. | 17% |
| Eterasys Networks, Inc. Securities Litig. | 15% |

Academic studies of post-PSLRA class actions bolster my opinion that CalPERS promised a reasonable fee. Choi *et al.* found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions. Choi *et al.*, *supra*, 83 *Washington University Law Quarterly*, at 897, Table 6A. Professor Michael Perino studied "a random sample of 244 post-PSLRA securities fraud class actions entered into between April 1997 and May 2005, inclusive." He found a mean fee of 20% in cases with public pension funds as lead plaintiffs. Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, St. John's University School of Law, Legal Studies Research Paper Series, Paper #05-0034 (Dec. 2005). In a later paper, Professor Perino "analyze[d] a random sample of 627 pre- and post-PSLRA settlements." He reported three central findings.

First, cases with public pension participation are positively correlated with settlement amounts (measured both in absolute terms and as a proportion of investors' overall market losses), even when controlling for institutional self-selection of larger, more high profile cases. Second, cases with public pension lead plaintiffs are positively correlated with two proxies for attorney effort, the number of docket entries in the case and the ratio of settlement to docket entries, suggesting that institutional monitoring may reduce attorney shirking. Third, attorneys' fee requests and fee awards are lower in cases with public pension lead plaintiffs, either because public pensions are sophisticated repeat players or as a result of attorney competition to represent these institutions.

Michael A. Perino, *Institutional Activism in Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions*, (October 2006), available at http://papers.ssrn.com/abstract=938722.   Perino concluded that "that public pension funds do act as effective monitors of class counsel."

In this case, class members received the benefit of the efforts of CalPERS, a leading public pension fund.  In percentage terms, the fee is also low even by comparison to cases which public pension funds led.  Therefore, there is every reason to think the fee CalPERS agreed that Coughlin Stoia would receive for representing the class is reasonable.

### 8.2.    Class Actions in General

The preceding section compared the fee promised by CalPERS to fees awarded in securities class actions following enactment of the PSLRA.  Fee awards in class actions in general have also been studied and may be thought to provide another baseline.

41

Before turning to the studies, I note that judges have awarded large percentage fees in class actions of other types that produced enormous recoveries. Most recently, a federal judge did so in a breach of contract lawsuit pitting a class of gas station owners against Exxon. In that case, in which I also submitted an expert report, the judge awarded class counsel 31.33% of a settlement fund of $1.06 billion. See *Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006).

Before the Exxon case settled, a district court judge in Illinois approved fees on the basis of a sliding scale in an enormous ERISA case: "29% of the amount of any Settlement Benefits recovered up to $250 million; ... 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; ... 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and ... 17% of any Settlement Benefits recovered in excess of $1,250 million." *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 *8 (S.D.Ill. 2005).

*In re Buspirone Antitrust Litigation*, MDL Docket No. 1413, 01-CV-7951 (JGK), slip op., Apr. 17, 2003, provides another recent example. There, negotiations produced a global settlement in excess of $500 million, of which $220 million was reserved for the Direct Purchaser Class. Notice of Proposed Settlement of Class Action and Hearing Regarding Settlement, *In re: Buspirone Antitrust Litigation*, http://www.gardencitygroup.com/cases/pdf/BUS/BUSNotice.pdf. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund, or $73.33 million.

*Exxon*, *IBM Personal Pension Plan*, and *Buspirone* are not unique. Many cases with settlements exceeding $100 million have yielded high percentage fees. In *Lucent Technologies*, 327 F.Supp.2d at 441, the trial judge published a table from which I excerpted settlements of $100 million or more. Table 7 includes both securities cases and lawsuits of other types.

| TABLE 7: FEE AWARDS IN CLASS ACTIONS WITH SETTLEMENTS EXCEEDING $100 MILLION | | |
|---|---|---|
| **Case** | **Recovery** | **Fee Award** |
| 1. In re Rite Aid Corp. Sec. Litig. (Rite Aid II), 269 F.Supp.2d 603 (E.D.Pa.2003) | $126 million | 25% |
| 2. In re Rite Aid Corp. Sec. Litig. (Rite Aid I), 146 F.Supp.2d 706 (E.D.Pa.2001) | $193 million | 25% |
| 3. In re Oxford Health Plans, Inc. Sec. Litig., MDL 1222 (S.D.N.Y. June 2003) | $300 million | 28% |
| 4. Informix Corp. Sec. Litig., Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 million | 30% |
| 5. In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D.Pa.2000) | $111 million | 30% |
| 6. In re Prison Realty Sec. Litig., Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 million | 30% |
| 7. In re Lease Oil Antitrust Litig., 186 F.R.D. 403 (S.D.Tex.1999) | $190 million | 25% |
| 8. Kurzweil v. Philip Morris Co., Inc., Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30% |
| 9. In re Combustion, Inc., 968 F.Supp. 1116 (W.D.La.1997) | $127 million | 36% |
| 10. In re Sumitomo Copper Litig., 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 million | 27.5% |
| 11. In re Home-Stake Prod. Co. Sec. Litig., MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 million | 30% |
| 12. In re Prudential Sec. Inc. Ltd. P'ships Litig., 912 F.Supp. 97 (S.D.N.Y.1996) | $110 million | 27% |

More recent cases have added to this list.  For example, in the ERISA portion of the Enron settlement, the aggregate settlement fund was worth $264,375,000 and the Court approved a 20% fee, observing that this amount was "well within the range of fees awarded in other similar cases."  *Amended Final Order Approving an Award of Attorneys' Fees, Reimbursement of Expenses, and an Incentive Award to the Class Representatives, In re Enron Corp. Securities and ERISA Litigations* (S.D. Texas—Houston July 24, 2006) (Judge Harmon), p. 3.  The Court also awarded almost $900,000 in expense reimbursements.

Now to empirical studies of class actions in general, of which there are several.  I will focus on two studies here: one from the mid-1990s, Thomas E. Willging, *et al.*, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996) (*FJC Study*); and one from 2004, Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 *Journal of Empirical Legal Studies* 27, 75 (2004) (*E&M Study*).[18]

Empirical studies once generated consistent findings.  Fee awards in settled class actions almost always fell between 20%-40% of the recovery and averaged about 33%.  For example, the *FJC Study*, *supra*, at 69 reported median fee awards in class actions "rang[ing] from 27% to 30%."  Consistency across the districts studied was remarkable, as shown in the table below.

---

[18] Other studies are available.  See, e.g., Theodore Eisenberg, Geoffrey P. Miller, and Michael A. Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After *Goldberger v. Integrated Resources, Inc.*(August 21, 2008). Washington University Journal of Law and Policy, Vol. 29; NYU Law and Economics Research Paper No. 08-39; St. John's Legal Studies Research. Available at SSRN: http://ssrn.com/abstract=1244322; Michael A. Perino, *Institutional Activism in Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions*, (October 2006), available at http://papers.ssrn.com/abstract=938122; Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 *Class Action Reports* 167 (2003).

**Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class**



Note: "Net monetary distribution" is net of attorneys' fees and administrative expenses.

Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).

The *2004 E&M Study* contained a larger and more diverse group of cases than the *FJC Study*, and more recent cases as well. It found that, in percentage terms, fees declined as recoveries grew. In the following figure, the diamonds show the mean fee percentages for all cases of the identified settlement sizes. The lines extending outward from the diamonds show the range of fees falling within one standard deviation of the means. Approximately two-thirds of the cases in each size category involve fee awards within these ranges. Importantly, the figures describe awards of fees only. They exclude

45

expense reimbursements.    If included, expense reimbursements would shift the distributions upward.

Looking to the far right of the bottom box, which summarizes one of two datasets Professors Eisenberg and Miller employed (the CAR dataset), one sees that in cases involving recoveries of $84 million and up, the average fee award equals slightly less than 20% of the recovery, and the range defined by the first standard deviation extends upward to 27%.  Looking at the top box, which summarizes what Eisenberg and Miller call the "reported opinion dataset," one sees a mean above 10% and a first standard deviation extending above 20% for cases with recoveries over $190 million.    The percentage requested in this case, 11.9% of the recovery, falls near the mean the *E&M Study* reports for the largest class of settlements using either dataset.[19]

---

[19] The most recent study by Eisenberg and Miller reports mean (median) fees in the cases decided across all circuits in the years prior to 2000 of 27.63% (30%) and mean (median) fees in cases decided after 2000 of 26.06% (26.94%). Eisenberg, Miller, and Perino, supra, at 18.  It also finds that fees decline as settlement size increases.

Figure 8: Fee percent range (one standard deviation) at levels of client recovery.



Source: Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27, 75 (2004).

The finding that fee percentages decline when recoveries become very large is robust. Fees also tend to be lower in securities fraud cases led by public pension funds like CalPERS.[20] Activism by public pension funds may also have driven down fee awards in non-securities class actions, as judges have applied fee standards derived from securities class actions to class actions of other types. Even so, the fee award requested in this case is reasonable for a settlement of this size.

9.     **THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEES PROMISED BY SOPHISTICATED CLIENTS**

Little is known about the percentages businesses and other sophisticated clients pay when acting as plaintiffs in litigation. They rarely release their agreements. That said, the limited evidence that is available shows that marginal percentages can be high even when the stakes are very large.

A famous case involving the Texas law firm of Vinson & Elkins ("V&E") exemplifies the use of contingent percentage compensation arrangements by sophisticated clients seeking large recoveries. ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket
>
> expenses as they were incurred, but all legal fees were contingent upon a
>
> successful outcome. We were paid 1/3 of all amounts received by way of

---

[20] See Eisenberg, Miller & Perino, supra, at 21 (suggesting that public pension funds are responsible for secular decline in fees that began in 1998).

settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation*, U.S. District Court, District of Arizona, MDL No. 551, Nov. 30, 1990.

Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery. Second, V&E bore no liability for out of pocket expenses. The percentage was high even though the deal was more favorable to the law firm than the usual contingent fee arrangement, which requires the lawyer to bear litigation costs and entitles the lawyer to reimbursement only if the plaintiff prevails. Third, the case was enormous. Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by V&E could possibly be made.

Sophisticated business clients still pay large contingent percentage fees today. Consider the recently concluded patent infringement litigation between NTP Inc. and Research In Motion Ltd., the company that manufactures the popular Blackberry. NTP promised its law firm, Wiley Rein & Fielding, a one-third contingent fee. When the case settled for $612.5 million, the Wiley firm received more than $200 million in fees. Yuki Noguchi *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, *Washington Post*, March 18, 2006, D03. Another 33% fee in an enormous commercial case.

In another case involving a sophisticated client with an enormous intellectual property claim, the plaintiff agreed to pay a scale of contingent percentages that rose then fell. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003).   After initially paying another law firm by the hour, Tanox ran out of money and retained a group of law firms on contingency.  "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million."   *Id.* at 248-249.   The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction."  "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249.   Like NTP, Tanox agreed to pay both a high percentage and a potentially enormous amount.

Another, and perhaps even more telling, example of a fee promised by a sophisticated client is described in *Synthroid II*.  There, financial intermediaries with tens of millions of dollars at stake agreed to pay outside law firms fees averaging 22 percent of the recovery even though a settlement was already on the table when the lawyers were hired.  The lawyers' job was merely to garner as much as possible of the settlement fund for the clients, not to litigate the case.  Given the lack of risk of non-payment, the size of the percentage reflects well on the fee set by CalPERS.  Here, the lawyers bore a significant risk of non-payment and incurred sizeable expenses on behalf of the class.

Other sources of information about fees paid by sophisticated clients also support the reasonableness of class counsel's fee request. In the report he filed in *In re: High Fructose Corn Syrup Antitrust Litigation*, Professor Coffee stated that the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%," respectively. In the same case, an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement. Three other corporate class members, Honickman Group, The Coca-Cola Company, and Admiral Beverage Corporation, submitted affidavits stating that they would have paid at least a 25% fee. *Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 1-2 (Oct. 7, 2004).

In the same lawsuit, class counsel submitted a list showing the contingent percentage fees agreed to by 6 named plaintiffs, all of which were businesses that purchased corn syrup. The percentages ranged from 20% to 33.33%, often varying with the duration of the lawsuit. *Plaintiffs' Supplemental Memorandum on Attorneys' Fees in Common-Fund Cases*, Exhibit E, submitted in *In re: High Fructose Corn Syrup Antitrust Litigation* (Oct. 7, 2004). I have also personally observed testimony by corporate representatives supporting fee awards in the 25-33% range.

Finally, many institutional investors have agreed to pay fees in the 12%-17% range after opting out of class actions. In *WorldCom*, the trial judge noted that "Milberg Weiss ha[d] filed at least forty-seven Individual Actions on behalf of over one hundred and twenty pension funds" that opted out of the class suit. *In re WorldCom, Inc. Securities Litigation*, 2003 WL 22701241 *2 (S.D.N.Y. 2003). According to the court, the opt outs agreed to pay Milberg Weiss "on a contingent fee basis with a base fee of

either 12 or 13%, plus expenses, and a cap of 17%." *Id.*, at *4. The fee schedule used in this case is lower than the WorldCom fee schedule.

10. **THE REQUESTED FEE IS REASONABLE UNDER PREVAILING ETHICAL STANDARDS GOVERNING THE CONDUCT OF ATTORNEYS**

As the American Law Institute explained its *Restatement (Third) of the Law Governing Lawyers*, when evaluating the reasonableness of an agreed fee a judge must ask three questions. "First, when the contract was made, did the lawyer afford the client a free and informed choice?" "Second, does the contract provide for a fee within the range commonly charged by other lawyers in similar representations?" "Third, was there a subsequent change in circumstances that made the fee contract unreasonable?" *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007). The answers to these questions make it clear, indeed obvious, that Coughlin Stoia's fee request is proper.

   10.1. **CalPERS Made "a Free and Informed Choice"**

When discussing the first question, the *Restatement* indicates that the "[r]elevant circumstances" include, inter alia, the client's sophistication and ability to interview other lawyers. *Id.* It then states that "[f]ees agreed to by clients sophisticated in entering into such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable." *Id.* (emphasis added). CalPERS, a highly sophisticated public pension fund with easy access to a competitive market for legal services and experience hiring lawyers, was represented by its General Counsel in fee negotiations. Given this, the *Restatement* obviously allows the Court to uphold the bargain.

**10.2.  The Agreed Fee is within the Range Charged by Lawyers in Similar Representations**

When discussing the second question, the *Restatement* makes the following observation: "To the extent competition for legal services exists among lawyers in the relevant community, a tribunal can assume that the competition has produced an appropriate level of fee charges." *Id.* As previously explained, the market for legal services in securities cases is highly competitive, with lawyers "literally falling all over themselves" in their rush to curry clients' favor. Given this, it hardly seems necessary to discuss the section question further.

One reaches the same conclusion when one compares the fee schedule in this case to the fees Lead Counsel and other law firms earned or were promised in other large cases. The comparability of fees was established above.

The decision to use a schedule of rising percentages does not render the agreement ethically suspect either. In *Formal Ethics Opinion 94-389*, the ABA expressly allowed this arrangement. In a section entitled "The Percentage of a Contingent Fee May Increase with the Amount of the Recovery," the Committee on Ethics and Professional Responsibility wrote that, "as a matter of ethics, … a percentage that increases with the amount of the recovery can be permissible…. Indeed, many would say that this form of contingent fee agreement more closely rewards the effort and ability the lawyer brings to the engagement than does a straight percentage fee arrangement, since everyone would agree that it is the last dollars, not the first dollars, of recovery that require the greatest effort and/or ability on the part of the lawyer." *Id.*

**10.3.  No Relevant Circumstances Changed**

The last question asked in the Restatement is whether a change in circumstances

rendered a fee unreasonable. The comment that addresses this issue starts by noting that "reasonableness is usually assessed as of the time the contract was entered into." *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007). *Formal Ethics Opinion 94-389* emphasizes this point, urging everyone "to keep in mind that the reasonableness as well as the appropriateness of a fee arrangement necessarily must be judged at the time it is entered into." Only truly exceptional circumstances can justify a decision to invalidate a fee agreement that was ethically proper when a representation began.

A large recovery does not satisfy this requirement, as the *Restatement* explains. "A contingent-fee contract … allocates to the lawyer the risk that the case will require much time and produce no recovery and to the client the risk that the case will require little time and produce a substantial fee. Events within that range of risks, such as a high recovery, do not make unreasonable a contract that was reasonable when made." *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007). This is the only position one can sensibly take. The entire purpose of a contingent fee agreement is to motivate a lawyer to obtain the largest possible recovery in the shortest possible amount of time. It would be irrational, even laughable, to invalidate contingent fee agreements when they achieve their greatest successes. In this case, the parties clearly anticipated the possibility of a settlement of this size. The third tier of the fee scale begins at $750 million and the total settlement is $925.5 million. Given this, the agreement ought to be enforced.

Every lead plaintiff hopes that its case will yield an enormous recovery. Every lead plaintiff also knows that, if its wish comes true, its contingent fee agreement will

generate an enormous fee for its attorneys. The time passed long ago when any of this could be regarded as surprising. Business clients have paid enormous contingent fees in private commercial disputes, and their payments have received widespread publicity. Large fees have also been paid in class actions, mass actions, and state Medicaid recovery lawsuits. CalPERS understood that an enormous recovery was a possibility, a possibility it wanted Lead Counsel to achieve. CalPERS also knew that the success it hoped for would entitle Lead Counsel to a commensurate fee.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.
Executed on:

_____1/25/09_____
Date

_____
Charles Silver