UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-1691(JMR/FLN)
CLASS ACTION

| | | |
|---|---|---|
| In re UnitedHealth Group | ) | |
| Incorporated PSLRA | ) | ORDER |
| Litigation | ) | |

Lead plaintiff, California Public Employees' Retirement System ("CalPERS"), seeks final approval of a proposed class action settlement, as well as an order granting its attorneys' fees. The Court heard oral argument on March 16, 2009.

The settlement is approved. Attorneys' fees and expenses are awarded as provided herein.

I.  Background

The Court need not restate the factual history underlying this case. The history is fully articulated in the Court's Order preliminarily approving the settlement in the shareholder derivative action, see In re UnitedHealth Group Inc. Shareholder Derivative Litig., 591 F. Supp. 2d 1023 (D. Minn. 2008), and in multiple other locations.

This consolidated case arises from a series of securities class actions, the first of which was filed on May 5, 2006, by James C. Krause. A number of additional related cases were filed, including an action filed July 7, 2006, by CalPERS. CalPERS also sought appointment as lead plaintiff in the consolidated actions, and asked that its counsel, Lerach Coughlin Stoia Geller & Rudman, be named as lead counsel. [Docket No. 30.] Other plaintiffs made

similar motions.

Congress has charged the Court, in the Private Securities Litigation Reform Act ("PSLRA"), see 15 U.S.C. § 78u-4(a)(3), with the duty of appointing lead plaintiff and lead counsel. The question was referred to the Honorable Franklin L. Noel, United States Magistrate Judge. By Order dated August 11, 2006, Judge Noel consolidated the securities class action cases. He further directed contending potential lead counsel firms to disclose, by confidential letter to the Court,

> any legal-ethical issues raised concerning each individual attorney, and that attorney's law firm in the past ten years. If any such matter has been resolved or concluded, please advise the Court of the outcome or resolution. If the matter is still pending, advise of the status of the matter, or the court in which it may be lodged.

[Docket No. 79.] Lerach Coughlin responded by letter dated August 18, 2006, disclosing the federal indictment of Milberg Weiss Bershad & Schulman, along with its partners David Bershad and Steven Schulman. Lerach Coughlin also disclosed that named partner William Lerach and others in the firm had been associated with Milberg Weiss prior to Lerach Coughlin's founding in 2004. The firm stated "Lerach Coughlin has never been the target or subject of this or any other grand jury investigation and the government has notified Mr. Lerach that it does not intend to take any action against him." The firm later gave an update regarding an attorney not involved in the UnitedHealth litigation.

On September 14, 2006, Judge Noel appointed CalPERS lead plaintiff and Lerach Coughlin lead counsel. [Docket No. 93.] This Court affirmed both appointments on October 31, 2006. [Docket No. 123.] On November 29, 2006, the Court enjoined defendant McGuire from exercising his UnitedHealth stock options. [Docket No. 148.]

Lerach Coughlin filed the consolidated class action complaint (the "Complaint") on December 8, 2006, claiming UnitedHealth and certain current and former officers and directors, including former chairman and CEO William McGuire, former director William Spears, and former general counsel David Lubben, violated federal securities laws. [Docket No. 149.] The Complaint alleged violations of sections 10(b), 14(a), 20(a) and 20A of the Securities Exchange Act of 1934, as well as sections 11 and 15 of the Securities Act of 1933. Pursuant to the PSLRA, discovery in this matter was automatically stayed. 15 U.S.C. § 78u-4(b)(3). Discovery proceeded in parallel shareholder derivative actions. UnitedHealth's special litigation committee ("SLC") conducted its own investigation.

In February 2007, defendants UnitedHealth, McGuire, and Spears moved to dismiss the Complaint. The motion was denied on June 4, 2007 [Docket No. 202], at which time the Court allowed discovery in this action. In mid-2007, the parties were unsuccessful in reaching a settlement.

In July and August 2007, CalPERS and Lerach Coughlin

negotiated a fee agreement.  Under its terms, CalPERS agreed to compensate Lerach Coughlin on an escalating schedule.  The firm was to receive 11% of any recovery up to $250 million; 12% of any portion exceeding $250 million; and 13% of any portion exceeding $750 million.  (See Expert Report of Professor Charles Silver, at 9, 15 [Docket No. 814] ("Silver Report")).  The Court was not advised of the agreement's existence, or its terms.

On July 18, 2007, CalPERS moved for partial summary judgment. The motion was denied.  On August 24, 2007, the parties commenced fact discovery, a process eventually yielding some 27 million document pages, 68 depositions - including those of 10 experts - and 15 discovery motions.

On September 15, 2007, one year after appointment as lead counsel, Lerach Coughlin advised the Court of a name change.  It was now called Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia").  [Docket No. 260.]  William Lerach retired from the firm.  The following month, Mr. Lerach pleaded guilty to a federal charge of conspiracy to obstruct justice arising from his association with the Milberg Weiss firm.

Meanwhile, the class action litigation proceeded.  In November 2007, plaintiffs moved to certify a class, defined as all persons, other than officers and principals of UnitedHealth, who acquired UnitedHealth stock between January 20, 2005, and May 17, 2006; who acquired stock in the merger with PacifiCare on December 20, 2005;

or who held stock during annual proxy solicitations from 2002 through 2006.  [Docket No. 465.]  The motion was eventually granted.

For a time, CalPERS sought to preserve assets that might be available to the class by litigating in the derivative action.  In December 2007, the parties to the derivative litigation proposed to settle their case, and moved the Court to lift its injunction freezing certain of Dr. McGuire's stock options.  CalPERS moved to extend the injunction.  CalPERS' motion was granted.  The Court also certified a question to the Minnesota Supreme Court, seeking clarification of Minnesota's business judgment doctrine and the degree of deference afforded an SLC's decision to settle a derivative case.  [Docket Nos. 315, 316.]

McGuire appealed the continued injunction to the Eighth Circuit Court of Appeals.  CalPERS was obliged to respond to McGuire's appeal and, at this Court's direction, briefed the certified question to the Minnesota Supreme Court.  The Minnesota Supreme Court answered the certified question in August 2008.  See In re UnitedHealth Group, Inc., Shareholder Derivative Litig., 754 N.W.2d 544 (Minn. 2008).

Meanwhile, the parties in the PSLRA action resumed settlement discussions in early 2008, assisted by former judges Layn Phillips and Daniel Weinstein, without success.  Defendants moved for summary judgment, as the parties prepared for an October trial.  In

June 2008, while motions were pending, the parties engaged in further settlement negotiations, leading to an agreement-in-principle on July 2, 2008. The proposed settlement disposed of all issues, except those involving McGuire and Lubben, who subsequently settled in principle on September 10, 2008. The parties continued to negotiate precise terms, and on November 24, 2008, jointly moved for preliminary approval.

The pending proposed settlement calls for a combined common fund class payment of $925,500,000. In addition, UnitedHealth has adopted significant changes in its corporate governance. McGuire agreed to cancel 3,675,000 UnitedHealth options and pay $30 million into the combined settlement fund. Lubben will pay $500,000 into the fund. McGuire and Lubben will not be reimbursed by the company.

The Court preliminarily approved the settlement on December 22, 2008, subject to appropriate notice to the class. Notice was (1) mailed to over 874,500 potential class members; (2) published in Investor's Business Daily and the Wall Street Journal; and (3) presented on a website. The Notice directed class members to file objections no later than February 17, 2009.

On February 15, 2009, an objection was filed by Harold Myers, a UnitedHealth shareholder. [Docket No. 841.] On February 17, 2009, shareholders Ernest J. Browne and Bruce Botchik filed objections [Docket No. 828], which they supplemented on February 18

and March 4, 2009. [Docket Nos. 829, 834.] The objections generally concerned Coughlin Stoia's proposed attorneys' fees. There were no objections to the settlement terms or reimbursement of lead plaintiff's expenses. Only 37 class members opted out of the settlement. [Docket No. 830.]

The Court now considers final approval of the proposed settlement, the plan of allocation, lead plaintiff's request for reimbursement of expenses, and lead plaintiff's application for attorneys' fees.

II. <u>Analysis</u>

A. <u>The Settlement</u>

Under Rule 23(e), class actions may only be settled if a court determines the settlement is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e); <u>Grunin v. Int'l House of Pancakes</u>, 513 F.2d 114, 123 (8th Cir. 1975). The Court acts as fiduciary, guarding the rights of absent class members. <u>In re Wireless Tel. Fed. Cost Recovery Fees Litig.</u>, 396 F.3d 922, 932 (8th Cir. 2005) ("<u>Wireless</u>"). The Eighth Circuit has found the PSLRA "was intended to supplement rather than replace Rule 23(e)," and "Congress did not intend to remove discretion from the district courts or usurp the district courts' traditional responsibility to guard the interests of absent class members." <u>In re BankAmerica Corporation Securities Litig.</u>, 350 F.3d 747, 752 (8th Cir. 2003). To determine whether a class action settlement is fair, reasonable, and

adequate, the Court considers the merits of the plaintiff's case weighed against the terms of the settlement, the defendant's financial condition, the complexity and expense of further litigation, and the amount of opposition to the settlement. <u>Van Horn v. Trickey</u>, 840 F.2d 604, 607 (8th Cir. 1988). The Court considers each factor in turn.

### 1. The Merits vs. The Settlement Terms

The "most important consideration" is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." <u>Wireless</u>, 396 F.3d at 933 (internal quotation omitted). The Court balances the risks and benefits of continued litigation against the benefits of an immediate and certain recovery. <u>See</u> <u>Grunin</u>, 513 F.2d at 124.

Here, plaintiffs allege violations of §§ 10(b), 14(a), 20(a) and 20A of the Securities Exchange Act of 1934, and §§ 11 and 15 of the Securities Act of 1933. These allegations survived a motion to dismiss for failure to state a claim.

After discovery, defendants sought summary judgment, claiming a lack of scienter, and arguing that CalPERS could not demonstrate loss or damage causation. They further moved for exclusion of plaintiffs' expert opinion on damages. The motions were pending when a settlement was reached. Had the Court - or a jury - agreed with defendants, plaintiffs' recovery would have been dramatically reduced.

The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval.

### 2. Defendants' Financial Condition

The $925.5 million settlement amount is substantial. The parties represent, and Court has no doubt, defendants are able to pay that amount. While one or more defendants could possibly pay more, "this fact, standing alone, does not render the settlement inadequate." Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1152 (8th Cir. 1999). This factor weighs in favor of approval.

### 3. Complexity And Expense Of Further Litigation

The benefits of the settlement must also be weighed against the potential cost of achieving a better result at trial. Wireless, 396 F.3d at 933. The Court estimates the trial, which had been set for October 2008, would have lasted at least four weeks. Without a doubt, both sides would have devoted dozens of attorneys and staff to the trial, and spared no expense to produce fact and expert witnesses.

Had plaintiffs prevailed, it is all but certain one or more defendants would have appealed. Indeed, at settlement, McGuire's appeal of the injunction was still pending in the Eighth Circuit. The Court harbors no doubt of the length and cost of further litigation. The case would have continued, and "all the while the class members would receive nothing." Wireless, 396 F.3d at 933

(internal quotation omitted).  Even if plaintiffs recovered more after trial and after appeal, it is highly questionable whether any additional sum would be more valuable than an immediate payment of $925.5 million.

The Court finds the expense of further litigation favors settlement approval.

4.  <u>Class Opposition</u>

As fiduciary to the class, the Court carefully considers class member objections.  <u>See</u> <u>BankAmerica</u>, 350 F.3d at 752.  Here, of over 874,500 potential class members receiving notice, there were no institutional investors' objections.  A mere 37 class members opted out.

The Court received only three individuals' objections. Objector Harold W. Myers bought and sold UnitedHealth stock during the class period.  His pro se letter dated February 15, 2009, raised several objections.  He argued the Notice, itself, contained misleading information about the objection deadline.  Myers' objection is overruled; the Court has already found the Notice sufficient to satisfy due process.  <u>See</u> <u>Petrovic</u>, 200 F.3d at 1153. Further, Myers' timely objection suggests notice was sufficient. He further objected that the plan of allocation, concerning § 10(b) claims for common stock, inadequately compensates short sellers, such as himself, and that CalPERS does not adequately represent short sellers.  These objections are also overruled.  The Court has

already found CalPERS an adequate lead plaintiff and class representative. Myers' objections touching the plan of allocation will be addressed below.

Objectors Ernest Browne and Bruce Botchik acquired UnitedHealth stock during the class period. Setting aside whether their objections were timely filed, the Court finds no objection to the settlement or its plan of allocation; their only challenge is to the request for attorneys' fees.

By any measure, these few objections are minuscule, strongly suggesting the class's overwhelming approval of the settlement. This factor weighs in favor of approval. <u>See Petrovic</u>, 200 F.3d at 1152 (approving settlement where fewer than 4% of class objected); <u>DeBoer v. Mellon Mortgage Co.</u>, 64 F.3d 1171, 1178 (8th Cir. 1995).

B.    <u>The Plan Of Allocation</u>

The Court considers the fairness of the settlement's allocation. The allocation plan distributes the settlement fund, net of attorneys' fees and expenses, to class members who submit valid and timely claims. If there are insufficient funds to fully pay each claim, then each claimant will receive a percentage of the fund based on the relationship between his or her claim and the total authorized claims presented.

Myers objects, claiming short sellers are not adequately compensated. His objection is without merit. The class period for Section 10(b) claims is divided into eight purchase periods,

11

ranging from one day to several months in length. The purchase periods are based on consultation with plaintiffs' damages experts. According to these experts, shares bought and sold within the same purchase period - regardless of the length of the period - give rise to no damages. (See Affidavit of Ramzi Abadou [Docket No. 813], at 53-54.) These experts hold, for example, that an investor who purchased shares on April 17, 2006, and sold them on April 18, 2006, sustained losses, while an investor who bought shares on January 20, 2005, and sold them on April 16, 2006, did not. Id.

The allocation plan reflects CalPERS' assessment of damages per share which could reasonably have been recovered at trial. Any investor's ability to claim damages depends on when the transaction occurred, which in turn reflects market information available on that date. Short sellers who sustained losses due to the conduct at issue in this litigation will be compensated; those who did not, will not. The Court finds that assessment reasonable and fair, and approves the plan of allocation.

C.    Reimbursement of Lead Plaintiff's Expenses

The Court may award a class representative "reasonable costs and expenses . . . directly relating to the representation of the class." 15 U.S.C. § 78u-4(a)(4). CalPERS requests reimbursement of $25,291.10, reflecting time spent overseeing the litigation and consulting with counsel. There has been no objection.

The Court awards CalPERS reimbursement in the amount

requested.  Coughlin Stoia does not seek direct reimbursement of its expenses, which it claims exceed $3 million (Abadou Aff. ¶ 17). Coughlin Stoia's expenses will be paid from its award of attorneys' fees.

    D.    Attorneys' Fees

    The Court may award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  An award of attorneys' fees is committed to the sound discretion of the trial court.  Petrovic, 200 F.3d at 1147.  "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process."  Fed. R. Civ. P. 23(h) advisory committee's note (2003).

    The PSLRA charges the Court with an independent obligation to ensure fees are reasonable.  See 15 U.S.C. § 78u-4(a)(6); In re Cendant Corp. Sec. Litig., 264 F.3d 201, 281-82 (3d Cir. 2001). Some courts considering PSLRA fee awards have found fees, agreed in advance by lead plaintiff and lead counsel, presumptively reasonable.  See Cendant, 264 F.3d at 282; In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 586 F. Supp. 2d 732, 767-68 (S.D. Tex. 2008); see also In re Cardinal Health Inc. Sec. Litig., 528 F. Supp. 2d 752, 758 (S.D. Ohio 2007) (endorsing but not applying presumption of reasonableness where no ex ante fee agreement existed).  The Eighth Circuit has yet to address this issue.

Coughlin Stoia asks the Court to award attorneys' fees using the formula in its fee agreement with CalPERS. If applied, this formula yields a fee of $110 million, or approximately 11.92% of the common fund. Coughlin Stoia supports its request with the expert report of Professor Charles Silver, who asks, "Can judges do better than lead plaintiffs when it comes to setting fees?" He believes not, because "[j]udges have neither better information, better access to markets, nor better incentives." (Silver Report at 26.) His argument rests on Adam Smith's premise that the self-regulated market knows best, and "prices are best set by buyers and sellers bargaining in a competitive environment." (Id. at 21.)

Seldom have the groves of academe and the ivory towers sheltered within their leafy bowers seemed farther from reality. A lecture on the virtues of the unrestrained free market sounds a bit hollow in light of the parties',[1] this Nation's, and indeed the world's, experiences with the beauties of self-regulated financial markets during a period remarkably coterminous with the existence of this case. The Court rejects the proffered expert's opinion.

---

[1]The Court notes the precipitous decline in the value of UnitedHealth's shares as only one example.

The idea that a contractual relationship, even ex ante,[2] between lead plaintiff and its attorneys forecloses any serious inquiry into the fee award, is simply wrong. Rule 23 and the PSLRA impose an independent duty on the presiding judge, and certainly not lead plaintiff or its counsel, to award a reasonable fee. This duty - that of a fiduciary to the absent class members - was reinforced, not eliminated, by the enactment of the PSLRA. See BankAmerica, 350 F.3d at 752.

Further, the fee agreement Professor Silver commends has been contracted between parties lacking the power to make it binding. Certainly the text of Rule 23 allows a court to award "reasonable attorney's fees" established "by the parties' agreement." Fed. R. Civ. P. 23(h). Here, the agreement was contracted by a single party - albeit lead plaintiff - and its chosen lead counsel. There is no evidence that any other of the hundreds of thousands of plaintiffs either signed it or knew of its existence.

Importantly, Rule 23 places the adoption of this agreement within the Court's discretion. This means the Court, not lead plaintiff and its lawyers, ultimately sets class action attorneys'

---

[2] It fair to ask what "ex ante" means in this case. The fee agreement was negotiated more than a year after the class action was filed, but more than a year before settlement was reached. It was negotiated shortly after the Complaint survived a motion to dismiss, with attendant diminution of the risk of non-recovery. In any event, its terms were not disclosed to the Court ex ante, and the Court was afforded no opportunity to consider it prior to the instant motion.

fees.  This is fully appropriate.  It is, after all, the Court, not
lead plaintiff, who must protect absent class members against
excessive fees.  The purported fee agreement may well bind lead
plaintiff and its counsel - whether or not it is enforceable
between them is not a question before the Court - but there is no
reason at all why this two-party agreement must bind hundreds of
thousands of additional, absent, plaintiffs in this class action.[3]

Lead plaintiff and lead counsel claim deference to their fee
agreement is also appropriate because they are exceptionally
skilled at what they do.  Lead plaintiff suggests the settlement
owes its size and scope entirely to lead counsel's perspicacity and
professional acumen.  This assertion is one-dimensional.  There is
no doubt plaintiffs' counsel's skill contributed to this recovery,
but it is one of many factors.  Others include the skill of
defendants' counsel, the influence of an increasingly-enlightened
board of directors, the existence - indeed, the mere threat - of
parallel proceedings, the defendants' size and solvency, the
defendants' willingness to admit wrongdoing, amounts or
availability of insurance coverage, the wisdom of a corporation's
SLC, a corporate defendant's concerns about its future in the
marketplace, and even - perhaps - each party's perceptions of the

---

[3]If CalPERS wishes to divide its aliquot portion of the
recovery between itself and its lawyers as provided in their fee
agreement, this Opinion should not be read to suggest any
opposition.

settlement mediator or the presiding judge. Certainly, the most important factors in any settlement are the overall strength of the case, the total potential damages, and each side's assessment - accurate or not - of the risks and benefits of going to trial.

Here again, the Court hears from Professor Silver. On this subject he declares that CalPERS, "the largest public employee retirement system in the United States," has been "known as an activist investor, frequently pressing the companies whose securities it holds to implement pro-shareholder reforms." (Silver Report at 32.) CalPERS, as one of UnitedHealth's largest shareholders, was certainly in a position to be an "activist" here, long prior to the instigation of this litigation. It might have reviewed UnitedHealth's option grant practices, disclosed them to the public, or demanded UnitedHealth modify them. Yet the Professor's report offers no hint that CalPERS did so. Neither does the report suggest CalPERS used its leverage to shop for any other counsel or negotiate a lower fee before filing its complaint - major reasons underlying some courts' deference to negotiated fee agreements. See Cendant, 264 F.3d at 282; Cardinal Health, 528 F. Supp. 2d at 758; Enron, 586 F. Supp. 2d at 768.

The Court recognizes lead counsel's history of securing large recoveries for its clients, earning it the reputation of the "most feared" adversary in securities litigation. Enron, 586 F. Supp. 2d at 773. At the same time, its previous first-named partner

neglected a significant obligation to the class: he failed to timely and fully inform the Court of his role in the Milberg Weiss debacle.

A suggestion of unethical conduct is relevant in determining whether a lawyer can adequately represent a class client. <u>See</u> 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u>, § 1769.1 (3d ed. 1998). The Court has previously expressed its view that most plaintiffs would prefer representation by an unindicted attorney, rather than by one who is under active criminal prosecution. For this reason, the Court has previously removed another lawyer associated with Milberg Weiss, even where the individual attorney was not personally accused of wrongdoing. <u>See</u> <u>In re Medtronic, Inc., Implantable Defibrillator Product Liability Litig.</u>, 434 F. Supp. 2d 729, 731 (D. Minn. 2006).

In July and August 2007, as CalPERS and then-Lerach Coughlin negotiated their fee agreement, Lerach was under federal investigation.[4] Had the truth been timely and fully disclosed to the Court, in all likelihood the Court would never have appointed his firm as lead counsel. <u>See</u> <u>id.</u> At the very least, the Court considers it appropriate to deduct from the fee award any time personally billed by Lerach. (<u>See</u> Affidavit of Keith Park at 2.)

---

[4] According to Professor Silver, the letter from CalPERS' general counsel setting forth the fee terms was dated August 24, 2007 (Silver Report at 15). Less than a month later, on September 18, 2007, the government issued a press release announcing Lerach's guilty plea.

For all these reasons, the Court declines CalPERS' invitation to defer to its fee agreement with Coughlin Stoia. This is a class action, not a contract dispute. In a class action, as is well-understood by a sophisticated party such as CalPERS, any fee agreement is subject to conditions: first, the Court's approval of lead plaintiff and lead counsel; second, a recovery (in the case of a settlement, also approved by the Court); and finally, the Court's approval of the fee itself. These parties well understood, when making their fee agreement, the fees were not theirs to establish. Ultimately, the Court does not, as Professor Silver suggests, "re-set fees on the back end" (<u>see</u> Silver Report at 25); rather, it sets the fees in the first place.

Accordingly, the Court now sets the fee. There are two generally accepted methods of calculating attorney fees: the lodestar and the percentage-of-the-fund method. The method chosen is committed to the Court's discretion. <u>Johnston v. Comerica Mortgage Corp.</u>, 83 F.3d 241, 246 (8th Cir. 1996).

The Court finds the percentage method is appropriate in a common-fund settlement such as this. <u>In re U.S. Bancorp Litig.</u>, 291 F.3d 1035, 1038 (8th Cir. 2002). The Eighth Circuit has yet to establish a set of factors to be used in setting an appropriate percentage of the fund.

In the absence of an Eighth Circuit test, this Court considers the following factors:

> (1) the benefit conferred on the class, (2) the risk to
> which plaintiffs' counsel were exposed, (3) the
> difficulty and novelty of the legal and factual issues in
> the case, including whether plaintiffs were assisted by
> a relevant governmental investigation, (4) the skill of
> the lawyers, both plaintiffs and defendants, (5) the time
> and labor involved, (6) the reaction of the class and (7)
> the comparison between the requested attorney fee
> percentage and percentages awarded in similar cases.

In re Xcel Energy Inc. Securities, Deriv. & ERISA Litig., 364 F.

Supp. 2d 980, 993 (D. Minn. 2005) (Doty, J.) (deriving factors from

Grunin and Johnson v. Georgia Highway Express, Inc., 488 F.2d 714,

717-20 (5th Cir. 1974)).  The Court has already addressed many of

these factors in the context of settlement approval above.

In considering a fee award, the "most critical factor" is "the

degree of success obtained."  Hensley v. Eckerhart, 461 U.S. 424,

436 (1983); Xcel Energy, 364 F. Supp. 2d at 994; see also Fed. R.

Civ. P. 23(h) 2003 advisory committee note ("For a percentage

approach to fee measurement, results achieved is the basic starting

point").  The PSLRA is in agreement, providing that the fee award

"shall not exceed a reasonable percentage of the amount of any

damages and prejudgment interest actually paid to the class."  15

U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6).

The benefit conferred on the class is substantial.  Lead

plaintiffs' counsel has obtained a total cash payment of $925.5

million, as well as significant corporate governance reforms.

McGuire has agreed to cancel more than three million tainted

options.  Counsel's skill unquestionably contributed to these

results.

Lead counsel also faced a substantial risk of non-recovery. Coughlin Stoia took the case on a contingent basis, advancing over $3 million in expenses. The litigation spans more than three years. Even after withstanding a motion to dismiss and obtaining class certification, success was not assured. Plaintiffs also faced questions of loss and damage causation, and the chance their § 14(a) claim was time-barred. McGuire argued for the legality of backdating and his own reliance on UnitedHealth's auditors and accountants.

These risks were, however, diminished by outside events. These include UnitedHealth's internal investigation and the publicly disclosed WilmerHale report, the resignations of McGuire, Lubben and Spears, as well as a massive public restatement of the company's earnings. Media and official reports disclosed the existence of parallel proceedings. Investigations were conducted by state and federal authorities, as well as UnitedHealth's SLC and plaintiffs in the derivative action. Each source advanced the factual record even in the face of the PSLRA's discovery stay. And UnitedHealth was, and is, solvent, reducing the risk that any eventual judgment would go unsatisfied.

Nonetheless, at the time of settlement, plaintiffs' counsel had miles to go before they were assured of a return on their investment. The Court finds counsel's willingness to assume this

risk weighs in favor of a substantial fee.

This was, undeniably, a complex case with difficult and novel legal and factual issues. Plaintiffs point to other dismissed backdating cases, and advise the Court that their theory was largely untested. Here, however, some of the difficulty was reduced. As described in the Court's Order denying defendants' motion to dismiss, the legal theory of liability underlying plaintiffs' complaint was fairly straightforward. At the same time, the Court knows this area of law is evolving. See Dura Pharmaceuticals v. Broudo, 544 U.S. 336, 346 (2005) (loss causation); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007) (scienter); Stoneridge Inv. Partners, LLC v. Scientific- Atlanta, Inc., 128 S. Ct. 761, 770 (2008) (reliance).

There is no question of the quality of lead counsel. Both they and their opposite numbers are exceptionally skilled. While hard-fought, the litigation was conducted cordially and efficiently. It is evident that absent counsel's willingness to work efficiently together, this case could well have lasted many more months, if not years.

This case has had almost no class objection, with the few objections directed to lead counsel's fees. Objections to the use of paralegals and contract lawyers are rejected, as these participants provide an efficient and appropriate method of staffing cases, reducing the need for associate and partner time.

See <u>Enron</u>, 585 F. Supp. 2d at 782-86.

While the Court compares the proposed award to awards in other cases, it is clear that this analysis is so fact-specific as to be of little use. It is possible to find cases approving larger percentages and disapproving smaller percentages. <u>Compare Petrovic</u>, 200 F.3d at 1157 (approving fee award of 24% of fund); <u>U.S. Bancorp</u>, 291 F.3d at 1038 (approving fee award of 36% of fund, for a total fee of $1.25 million); <u>Enron</u>, 585 F. Supp. 2d at 801 (approving fee award of 9.52% of fund, for a total fee of $688 million); for additional examples <u>see</u> Silver Report at 43. Suffice it to say, counsel's requested fee of 11.92%, or $110 million, is neither so immense as to be without precedent, nor so paltry as to discourage counsel from taking worthy cases. It is roughly similar to at least one fee recently awarded by another district court faced with a common fund of similar size. <u>In re Royal Ahold N.V. Securities and ERISA Litigation</u>, 461 F. Supp. 2d 383, 385 (D. Md. 2006) (approving fee award of 12% of $1.1 billion fund, for a total fee of $130 million).

However, the Court finds it appropriate to reduce the percentage as the size of the recovery increases. <u>See</u> <u>Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force</u>, 108 F.R.D. 237, 256 (3d Cir. 1985). A declining percentage is appropriate for two reasons. First, it recognizes that the amount recovered owes at least as much to the defendant's size and

solvency, as to counsel's skill.  Second, the Court finds any risk

that declining percentages will force class action counsel to

settle "too early and too cheaply" is overstated.  See Cendant, 264

F.3d at 284 n. 55.

Accordingly, after considering the factors set forth in Xcel

Energy, the Court considers 7% to be an appropriate percentage of

the fund, yielding a fee of $64,785,000.

To ensure the fee's reasonableness, the Court has made a

lodestar cross-check.  The Eighth Circuit identifies four factors

in setting a reasonable lodestar fee:  (1) the number of hours

counsel expended; (2) counsel's "reasonable hourly rate"; (3) the

contingent nature of success; and (4) the quality of the attorneys'

work.    See Grunin, 513 F.2d at 127.   A court must exclude

inadequately documented hours or those not reasonably expended.

Hensley, 461 U.S. at 434.   A court then multiplies "the hours

reasonably expended" by "a reasonable hourly rate."   Id. at 433.

Counsel are expected to exercise "billing judgment" in their fee

application, making a "good faith effort to exclude from a fee

request hours that are excessive, redundant, or otherwise

unnecessary."   Id. at 434.

Counsel claim they have billed over 45,000 hours, yielding a

lodestar exceeding $18 million.  Reviewing counsel's submissions,

the Court finds their "billing judgment" wanting; the submissions

reflect rates far beyond those charged in the Twin Cities market,

24

as well as considerable time billed by staff which is properly counted as overhead. Accordingly, the Court finds it efficient and appropriate to recalculate the lodestar.

In the Twin Cities area, the Court finds a reasonable hourly rate for partner time to be $500; for other attorneys - whether counsel, associate, or contract attorneys, $200; and for paralegals, $100. All other staff time is overhead. Reviewing counsel's submissions with these values in mind, the Court finds counsel have collectively billed 11,525.72 partner hours (minus attorney Lerach's time), 16,218.25 other attorney hours, and 9,721.60 paralegal hours, for a total of 37,465.57 hours. Applying the rates set forth above, this produces a lodestar of $9,978,670.

In cases where fees are calculated using the lodestar method, counsel may be entitled to a multiplier to reward them for taking on risk and high-quality work. Counsel's requested fee of $110 million represents a multiplier slightly over 11. By way of comparison, the multiplier in <u>Enron</u> - a case lasting nearly twice as long, and resulting in a settlement more than 7 times as large - was 5.39. <u>Enron</u>, 585 F. Supp. 2d at 798-99. The multiplier in <u>Royal Ahold</u> was 2.57. <u>Royal Ahold</u>, 461 F. Supp. 2d at 385.

As already noted, the percentage-of-the-fund method yields a fee of $64,785,000. Using the Court-calculated lodestar, this fee would represent a multiplier of nearly 6.5. The Court finds this multiplier appropriate under <u>Grunin</u>. Counsel has not requested an

award of expenses, opting to reimburse itself from its fee.  It has further has agreed to compensate other class counsel from this sum. Considering all these factors, the Court finds a total fee of $64,785,000 to be reasonable.

III.  <u>Conclusion</u>

For the foregoing reasons, Lead Plaintiff's motion for approval of the settlement is granted.  Lead Plaintiff's motion for attorney fees is granted.  The Court sets attorney fees in the amount of $64,785,000.  Lead Plaintiff shall be reimbursed for its expenses in the amount of $25,291.10.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 10, 2009

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Judge